```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3
    UNITED STATES OF AMERICA,        .
 4                                   .
             vs.                     . DOCKET NO. SA:17-CR-391
 5                                   .
    RAUL RAMOS, ET AL,               .
 6                                   .
                 DEFENDANTS.         .
 7

 8

 9            TRANSCRIPT OF MOTION PROCEEDINGS
           BEFORE THE HONORABLE XAVIER RODRIGUEZ
10             UNITED STATES DISTRICT JUDGE
                    MARCH 19, 2018
11

12

13  APPEARANCES:
    FOR THE PLAINTIFF:     CHRISTINA LAURA PLAYTON, ESQUIRE
14                         RUSSELL DeWITT LEACHMAN, ESQUIRE
                            ON BEHALF OF THE UNITED STATES
15

16  FOR THE DEFENDANTS:    GEORGE B. DOMBART, ESQUIRE
                            ON BEHALF OF RAUL RAMOS
17                         BRANDON TODD HUDSON, ESQUIRE
                            ON BEHALF OF ANGEL CANTU GARCIA
18                         TERRENCE W. McDONALD, ESQUIRE
                            ON BEHALF OF ROBERT M. CANTU
19                         TYLDEN SHAEFFER, ESQUIRE
                            ON BEHALF OF MARIANO VALDEZ, III
20                         DANIEL JAMES VELA, ESQUIRE
                            ON BEHALF OF FERNANDO GONZALES
21                         RONALD PERRY GUYER, ESQUIRE
                            ON BEHALF OF RICHARD GAMEZ
22                         JOHN MICHAEL ECONOMIDY, ESQUIRE
                            ON BEHALF OF ARTHUR GALLEGOS
23                         JOHN FAHLE, III, ESQUIRE
                            ON BEHALF OF DANIEL GARZA
24

25
```

```
1                         JEFFREY MULLINER, ESQUIRE
2                            ON BEHALF OF RICKY ESCOBEDO
                          ANTHONY B. CANTRELL, ESQUIRE
3                            ON BEHALF OF JIMMY LEE ZUNIGA
                          SOSTENES MIRELESS, II, ESQUIRE
4                            ON BEHALF OF MIGUEL HERNANDEZ
                          ALLEN F. CAZIER, ESQUIRE
5                            ON BEHALF OF RAMIRO R. CARRIZALES
                          BERTRAM OLIVER WOOD, III, ESQUIRE
6                            ON BEHALF OF ABEL JOSEPH GUERRERO
                          MR. GILMORE, ESQUIRE
7                            ON BEHALF OF JOE PEREZ, III
                          ROBERT OTTO SWITZER, ESQUIRE
8                            ON BEHALF OF JULIAN ROSAS GARZA
                          SCOTT W. McCRUM, ESQUIRE
9                            ON BEHALF OF JUAN JOSE GONZALES
                          JAMES SCOTT SULLIVAN, ESQUIRE
10                           ON BEHALF ROMAN GABRIEL GONZALES
                          EDWARD F. GARZA, ESQUIRE
11                           ON BEHALF OF ANGEL ARREDONDO
                          ANTHONY MARTIN SMITH, ESQUIRE
12                           ON BEHALF OF JOHNNY RAY MORALES
                          MICHAEL J. MORRIS, ESQUIRE
13                           ON BEHALF OF ALFRED GARANSUAY
                          DAVID CAVAZOS, ESQUIRE
14                           ON BEHALF OF FRAN MARIE GONZALES
                          JEB DANIEL LOCK, ESQUIRE
15                           ON BEHALF OF ARTURO GARCIA BERNAL
                          RICHARD EMIL LANGLOIS, ESQUIRE
16                           ON BEHALF OF ROBERTO HERNANDEZ
                          JON R. DISRUD, ESQUIRE
17                           ON BEHALF OF ALBERT GUERRA MATA
                          MICHAEL W. McCRUM, ESQUIRE
18                           ON BEHALF OF ROBERT RODRIGUEZ
                          ALBERT A. FLORES, ESQUIRE
19                           ON BEHALF OF PEDRO TORREZ
                          EDWARD CAMARA, JR., ESQUIRE
20                           ON BEHALF OF JESUS RODRIGUEZ
                          BERNARD CAMPION, ESQUIRE
21                           ON BEHALF OF FREDERICK ROCHA
                          JAVIER N. MALDONADO, ESQUIRE
22                           ON BEHALF OF OSCAR MARTINEZ
                          ROCHELLE M. ACEVEDO, ESQUIRE
23                           ON BEHALF OF JOSE LUIS CORTEZ
                          THOMAS JOSEPH McHUGH, ESQUIRE
24                           ON BEHALF OF MARC THOMAS REYES
25
```

```
REPORTED BY:              GIGI SIMCOX, RMR, CRR
                          OFFICIAL COURT REPORTER
                          UNITED STATES DISTRICT COURT
                          SAN ANTONIO, TEXAS
```

1      *(San Antonio, Texas; March 19, 2018, at 1:30 p.m., in open*
2  *court.)*
3           THE COURT:  17CR391, U.S. versus Raul Ramos, and
4  others.  Let's go through a roll call.
5      (Roll call was conducted.)
6           THE COURT:  We've got, I believe, 27 pending motions.
7  We'll see where we're at on some of this.  Some of these
8  hopefully will be easily disposed of or deferred.
9           For the government, is who?
10          MS. PLAYTON:  Yes.  Christina Playton on behalf of
11  the United States, with AUSA John Gibson, Russ Leachman, and
12  Karen Norris, who is appearing specifically only related to
13  the matters of the taint review.
14          And before we proceed, your Honor, the United States
15  has a motion to quash.  Mr. Economidy has issued subpoenas to
16  AUSA Karen Norris and former federal employee David Shearer.
17  In conformance with the Touhy regulations we asked
18  Mr. Economidy to provide us with the details of what it was he
19  was seeking by way of a subpoena from those witnesses.
20          It was my understanding upon arriving here today --
21  that is done through John Pancizyn [phonetic] at our office --
22  that Mr. Economidy had not responded to that.  In speaking
23  with Mr. Economidy, he provided me what purports to be his
24  response from Friday afternoon.  And so I've just now had a
25  chance to see that response.

1    It does not change our position on the motion to

2   quash.  Mr. Economidy is seeking to obtain testimony from

3   Miss Norris and Mr. Shearer.  Specifically he's asking -- they

4   are both present in court, let me tell the Court that.  They

5   are both here in the court.  Mr. Shearer is in the back.  But

6   he is seeking to ask them questions related to what they wrote

7   in the motion.

8    Mr. Shearer, he wants to know what is the form of the

9   basis for what he wrote in the motion.  They are both here and

10  can address the Court as officers of the court.  Miss Norris

11  is going to address the Court outside my hearing with regard

12  to the procedures that were used in the taint review and any

13  questions the Court has.

14   So, first and foremost, it's unnecessary, but the

15  defendant has not complied with Touhy regulations in the sense

16  that he has not in advance given us notice of exactly what it

17  was he was going to ask.  But in addition, some of the things

18  that he wants to ask them are things like, Have you ever been

19  to Geo?  Do you know how hard it is to communicate with

20  your -- with the -- your clients in Geo?  All of these would

21  be unnecessary questions, things of which would not help the

22  Court resolve the issue.

23   I have a written motion to quash, if the Court wants

24  that at this time.  I thought we could address it orally, as I

25  don't believe their testimony is necessary, first and

1  foremost.

2         THE COURT:  Okay.  We'll take up that when I get to

3  it.

4         So going down my list, first we have a motion by

5  Roberto Hernandez to seek suppression of evidence from 1518

6  Amanda, Apartment 134.  Those are two motions, 775 and 776.

7         Mr. Langlois, you filed that motion.  I guess my

8  question is:  This motion was just filed on March 16th, can it

9  be heard on the same day as we have the other motion to

10  suppress filed by defendant Robert Rodriguez on April 3rd?

11         MR. LANGLOIS:  Probably it can be, your Honor.  I

12  think it's pretty much -- I don't know that it will require

13  any testimony, but I think it could be pretty much done on

14  briefs, or something like that.

15         THE COURT:  And then my second question, Mr. Langlois

16  is:  There are two motions, 775 and 776; are these duplicates

17  or can I moot 775?

18         MR. LANGLOIS:  There was one that had the -- had 361

19  instead of 391, your Honor.

20         THE COURT:  Okay.  So the first motion, 775, is

21  dismissed as moot.  776 is pending, and we'll hear that on

22  April 3rd.

23         The next set of motions are docket numbers 730, 747,

24  751, 763, and 767.  They are all requests for 404(b) evidence

25  filed by attorneys Campion, Jeb Lock, and Scott McCrum.  They

1  are requesting that the government produce before trial any

2  evidence of other wrongs, crimes, or acts it intends to use

3  against them.

4          What's the government's response?

5          MS. PLAYTON:  We will provide notice of all 404(b).

6          THE COURT:  And when will you have notice provided

7  by?

8          MS. PLAYTON:  What is the Court's normal order before

9  trial?  Is it 20 days?

10         THE COURT:  Well, we need to work on a scheduling

11 order here at the end of all of this.  But I mean, rather than

12 wait, I mean, why isn't something like that -- why can't that

13 be done within two weeks?

14         MS. PLAYTON:  Well, honestly, because we're going to

15 be responding in writing to the motions to suppress that were

16 just filed, and in order to be thorough I would prefer to file

17 it at a later time.  I am already in receipt of many of their

18 criminal histories and I'll be reviewing them, but they are

19 lengthy, and so that I can provide adequate notice I think

20 perhaps 45 days from today or prior to trial.

21         THE COURT:  Okay.  Someone keep track on me too, so I

22 don't forget things.

23         When we talk at the end about a scheduling order,

24 remind me to get a deadline on the government to give the

25 404(b) evidence.

1        So with regard to docket numbers 730, 747, 751, 763,

2   and 767, those motions are all granted.

3        Then we have another set of motions, 728 and 762

4   filed by attorney Campion and Jeb Lock requesting limine of

5   any other extraneous crimes or misconduct by the accused or

6   other defense witnesses.

7        MS. PLAYTON:  Your Honor, I'd ask that you defer this

8   until we have had an opportunity to litigate -- to first

9   provide notice and litigate any other issues that we need to.

10       THE COURT:  So Mr. Campion and Mr. Lock, let me hear

11  from you.  If I'm going to give a deadline on the 404(b)

12  evidence, shouldn't we put that first and then we defer the

13  motion in limine until after I do that?

14       MR. CAMPION:  I would agree with that, your Honor.

15       MR. LOCK:  That would be fine, Judge.

16       THE COURT:  Okay.  So 728 and 762 remain pending and

17  we need to have a motion in limine conference that we need to

18  insert into the scheduling order.

19       Next motion, motion for James hearing, docket number

20  731, Mr. Campion's motion.  The movant requests that the

21  government satisfy to the Court the existence of a conspiracy,

22  and that the statements of coconspirators were made during the

23  course and in furtherance of the conspiracy before admitting

24  such statements.

25       What's the government's response?

1          MS. PLAYTON:  It's twofold.  First, this is a Hobbs

2    Act conspiracy and so there are many defendants in this case.

3    But more importantly, this ruling is better made at or near

4    the time of trial, and at or near the time you know which

5    defendants are pending for trial, which statements would be

6    relevant, and as part of the trial.  And so if the Court -- I

7    would ask the Court either to dismiss at this time as

8    premature, or to defer it until a later time.

9          THE COURT:  And so with regard to Frederick Rocha,

10   the only person bringing this motion -- I guess there is

11   others who are joining, and I'm not sure at which point -- if

12   they are joining all motions or not, but let's just focus on

13   Mr. Rocha.  Does the government have any proffer at this time

14   as to how he's involved in the conspiracy?

15          MS. PLAYTON:  You mean, in terms of his involvement?

16          THE COURT:  Right.

17          MS. PLAYTON:  Yes.  Let me speak with the FBI agent.

18     (Off the record discussion.)

19          MR. LOCK:  Your Honor, if I may.

20          THE COURT:  Yes.

21          MR. LOCK:  Going back to the 404 motion that you

22   granted, I think that's part of the reasons why everybody has

23   filed a motion to join, so we don't have to -- so you don't

24   have to receive those motions.  I think if you could make a

25   blanket order to just provide the 404 for all the defendants,

1    and then that way we don't all have to individually file for

2    that motion.

3            THE COURT:  Yeah, no.  That's my intent.  So that's a

4    global ruling as to all defendants.  Thank you.

5            MS. PLAYTON:  Your Honor, no, we are not prepared to

6    address that at this time.  I was under the impression that we

7    were going to deal strictly with the motions filed by --

8    relating to the search of the cell, and so I did not prepare

9    the agents for that.

10            THE COURT:  So, Mr. Campion, I mean, in cases as

11    complex as this, the Court doesn't have to hold a pretrial

12    hearing and can conditionally admit the challenged statements

13    until a determination of Rule 801(d)(2), predicate facts, can

14    be made.  I mean, why should I have two hearings at this

15    point?

16            MR. CAMPION:  I don't know that it would be legally

17    required, your Honor.  In terms of preparation, it makes it

18    difficult in a situation that's as complex as this one.  Of

19    course, as you are aware, the indictment alleges two separate

20    conspiracies, one a Hobbs Act conspiracy, and one a drug

21    conspiracy.  My client, Mr. Rocha, is only named in the Hobbs

22    Act conspiracy.  And, of course, this gets to the severance

23    issue that we have raised.

24            But I think when we start intermingling the

25    statements of coconspirators on different conspiracies, it is

1   a situation that I fear at the last minute may be difficult to

2   address.

3         MS. PLAYTON:  Your Honor could carry that issue with

4   the actual trial itself.  That is actually a very common

5   practice with that type of issue.

6         THE COURT:  Let me defer ruling on that and I'll

7   continue to take that under advisement as I take up the

8   motions to sever and the other issues in this case.

9         Next motion is a motion for bond by Mr. Fonseca,

10  docket number 701.

11        MS. PLAYTON:  That was addressed this morning.

12        THE COURT:  That's my question.  Mr. Gutierrez?

13        Is he here?  No?  So, yeah, Mr. Gutierrez is not

14  here.

15        That's still showing as pending at the magistrates.

16        MS. PLAYTON:  It was heard.  And actually I got a

17  text order that the court denied it and that was ruled on this

18  morning.

19        THE COURT:  Yeah.  It's still showing up as a pending

20  motion --

21        If you can check on that, Becky.

22        Next issue, Rocha's motion for bond and inpatient

23  treatment, docket number 720.

24        Mr. Campion, is this still with the magistrate?

25        MR. CAMPION:  It's still with Judge Bemporad.  He's

1   already had two evidentiary hearings on this, and it's an

2   issue that I'm hoping we can get worked out.  I've had a

3   chance to touch base very briefly with the prosecutors, the

4   new prosecutors on this case.  I think, given a minimum amount

5   of time, hopefully we can get it resolved.  But, if not, we

6   would perhaps request that it be taken up again, but I think

7   it's pending in Judge Bemporad's court.

8           THE COURT:  But whose ball is it?  Is it in the

9   magistrate's to-do list, or is there something else that needs

10  to be done?

11          MR. CAMPION:  No, it's on the docket in the

12  magistrate's court.  It's pending there.  And, as I said --

13          THE COURT:  I guess it would be more polite, has he

14  just not ruled on it, or why is it taking so long?

15          MR. CAMPION:  No, what's happening, your Honor, is at

16  the initial detention hearing Mr. Rocha was placed on bond

17  conditioned upon inpatient treatment and there was some

18  difficulty finding a placement.  He couldn't go to

19  in-placement treatment until he had a place to discharge to.

20  It took a long to him to get a suitable residence for him to

21  discharge to.

22          Subsequent to that, he was put in inpatient treatment

23  and there was an issue arose there and he was sent back to San

24  Antonio.  We had another hearing in front of Judge Bemporad.

25  He did not revoke his bond.  He left him on bond, conditioned

1  upon placement in another suitable in-placement treatment

2  program.  We've been unable to locate one because he's

3  indigent.  If he had funds, he would already be in placement.

4  He would already be in treatment.  But because of his

5  indigency, he's dependent upon programs that are basically

6  funded by the government, which is very limited, and there has

7  been none available to this point.

8        So what we're asking the judge to consider -- it's in

9  front of Judge Bemporad, but we would be happy to have this

10 Court rule on it -- what we're asking the Court to consider

11 is -- he's been over a year of testing clean and satisfactory

12 participation in the treatment programs he has been in.

13       We're asking the Court to consider, in lieu of

14 inpatient treatment, which we just don't have available,

15 unfortunately, to consider an electronic restriction like

16 electronic monitor with intensive outpatient.

17       THE COURT:  Okay.  Yeah, at this point, I'm not going

18 to usurp Judge Bemporad's role.  I guess I was more curious

19 about what was happening.  So it is being tended to?

20       MR. CAMPION:  I talked to them last week.  Judge

21 Bemporad was on vacation, I think, but he's supposed to be

22 back today.

23       THE COURT:  I'll leave it with him.  Thank you.

24       So then that takes us to motions to sever, docket

25 number 729, 739, 744, and 754 filed by attorneys Campion, Jeb

1    Lock, Albert Flores, and Kevin Collins.  And so I was going to

2    ask if there is any other argument or evidence in support of

3    the motions, and so Mr. Campion raised the distinction between

4    some individuals charged solely as a Hobbs conspiracy and

5    others charged solely as a drug conspiracy.  That's an

6    interesting way of looking at this.  I had not been looking at

7    the defendants' cases that way.

8           Can a clear distinction be made in this case that

9    way, or not?

10          MS. PLAYTON:  No, your Honor.

11          The Hobbs conspiracy relates to the collection of the

12   dime which involves the drug trade, and so all of the acts

13   that would form the basis of the allegations in Counts 1 and

14   Counts 2 would be the same and similar.  They are all related

15   and it's part -- each act is in furtherance of either the

16   Hobbs conspiracy and the drug conspiracy.  So based on the

17   counts, there is no basis for severance.

18          Additionally, I would point out to the Court that

19   these defendants have all sought to join each other's motions,

20   which is indicative of how they are related and similarly

21   situated.  All of the facts and circumstances regarding how

22   they acted and with regards to any of the counts and with

23   regards to each other would be relevant and would come in for

24   each defendant.

25          THE COURT:  So without doing like a tally, are there

1   any defendants just charged on the drug conspiracy that are

2   not charged in the Hobbs conspiracy?

3               MS. PLAYTON:  There are.

4               THE COURT:  How many?

5               MS. PLAYTON:  I'm going to ask -- actually call upon

6   Mr. Shearer.

7               David, would you come up?

8               THE COURT:  Only two?

9               MS. PLAYTON:  Yes.

10              THE COURT:  Out of the 33, 29, whatever it is?

11              MS. PLAYTON:  Yes.

12              THE COURT:  Okay.  So as, Mr. Shearer, you walk up,

13  I'm going to say there is no need.

14              I'm going to take the motions to sever under

15  advisement, unless -- let me get Mr. Campion, Mr. Lock,

16  Mr. Flores, and Mr. Collins, anybody want to say anything new

17  that you have not said already in your motion?

18              MR. FLORES:  Can I approach, your Honor, please?

19              THE COURT:  Yes.

20          (At the bench.)

21              MR. FLORES:  Aside from regular issues that crimes of

22  all, you know, shouldn't be placed on our guy.  In particular,

23  I think it's probably my guy, maybe a couple of other guys,

24  that either claim to have disengaged, or are no longer a part

25  of the mafia issue.  The reason I'm up here is because of a

1  problem.

2         THE COURT:  Apparently disengagement is frowned on.

3         COURT REPORTER:  I'm having difficulty hearing you.

4         MS. PLAYTON:  She can't hear you.

5         MR. FLORES:  Yes.  So those are arguments I would

6  like to bring up on my particular guy, my particular motion,

7  which is why I filed it.  If he's no longer -- and if we have

8  some sort of cutting-off point that we can prove.

9         THE COURT:  But I guess what I'm having trouble with

10 that whole disengagement theory is, isn't he charged for

11 activities that he was participating in, allegedly, while he

12 was still a member?

13        MR. FLORES:  Well, I'm arguing no.  I'm arguing that

14 the break happened before that point.  I just don't know if I

15 can prove that.  That's the only separate issue.

16        MS. PLAYTON:  And, your Honor, I would like to file a

17 written response.  I mean, most of these motions were filed

18 just last week, and I actually was not aware that we were

19 going to hear them substantively today.

20        THE COURT:  Your client is Pedro Torrez?

21        MR. FLORES:  Yes.

22        THE COURT:  The only reason I'm having the hearing

23 all at the same time is with these number of defendants I

24 can't have multiple hearings here, it's just too problematic,

25 so...

 1          MS. PLAYTON:  I would ask the Court to perhaps

 2   reconsider some way because it could -- having them all at

 3   once and having them altogether all the time could foster the

 4   sense of sort of a gang mentality, which would make it

 5   challenging to move the case.

 6          THE COURT:  I understand that too, but then, I mean,

 7   they all have a right to be present during the trial

 8   proceedings, so, I mean, how do I get around that?

 9          MS. PLAYTON:  Trial is a separate issue.

10          THE COURT:  I'm talking about pretrial.  They have a

11   right to be present for all parts of their case.

12          MS. PLAYTON:  But there are some motions that would

13   be unique to each defendant --

14          MR. FLORES:  Like this.

15          MS. PLAYTON:  -- actually.

16          THE COURT:  So let's do this.  With regard to the

17   severance, file your responses to everybody who has filed.

18   And everybody who is making unique arguments, file a tailored

19   response individually, for example, like Mr. Flores's client.

20   And so, you know, get that in as soon as you can.

21          MR. LEACHMAN:  Another thing that I think you're

22   going to find, I mean, a lot of these people won't be here,

23   come trial day.  And the ones that are, there may be some

24   divisions that make some sense and you're not going to be able

25   to determine those as you look at the sea of people until we

1    start moving some of the case.

2            THE COURT:  Until I start making some kind of

3    rulings, we are not going to get some movement here.

4            MR. LEACHMAN:  We are going to start working in

5    earnest on that, Judge.  Well, one of the things, Judge -- the

6    other thing, and I guess we'll let the Court know, is we are

7    likely going to supersede the case, and we are going to go to

8    a bunch of these folks before we do that and see where we're

9    at.  So we anticipate that may --

10           THE COURT:  Well, for now, let's just get a response

11   to all the various severance motions.  If it can be a global

12   response, great.  If it needs to be tailored, let's tailor it.

13           MS. PLAYTON:  Okay.

14       (Open court.)

15           THE COURT:  Mr. Disrud, are you present now?

16           MR. DISRUD:  Yes, your Honor.  I apologize for being

17   late.

18           THE COURT:  Thank you.

19           With regard to the motions to sever, Mr. Campion

20   Mr. Lock, or Mr. Collins, any our other new arguments you want

21   to make that are not already in your current motions?

22           MR. CAMPION:  If I could approach, your Honor?

23           THE COURT:  Come on up.

24       (At the bench.)

25           MR. CAMPION:  There is another issue that's not in

1  motion, your Honor.  It is the testimony at the detention

2  hearing, the two of them we've had established that Mr. Rocha

3  had actually severed ties with the Mexican Mafia, at least a

4  year prior to his indictment.

5          And he is classified as an ex-member.  He's not even

6  associated with the Mexican Mafia right now.  Of course, being

7  an ex-member has been an issue with getting him into a

8  treatment program, as far as places that will take him when

9  they are concerned about potential threats and whatnot, so...

10  But I didn't put that in the motion, but there is a

11  distinguishing factor between him and the others, and that is

12  that he's not one of them anymore.

13          THE COURT:  So we just had that issue here, and so

14  with regard to any of your response, let's try to make it

15  clear whether or not this defendant is charged with acts that

16  he engaged in while he was still a member.

17          MS. PLAYTON:  Well, I mean, his claim here at the

18  bench that he wasn't a member may be contravened by the very

19  facts of his participation in the conspiracy, so...

20          THE COURT:  Right.

21          MR. CAMPION:  His actions in the conspiracy were

22  completely before this.  I mean, they go way back.

23          THE COURT:  So at some point I need to have an

24  understanding of just who was a member and who wasn't a

25  member, because this goes back to that Hobbs claim, and so who

1    is being charged with activities under Hobbs, and so...

2         MS. PLAYTON:  And who is taking acts in furtherance

3    of the conspiracy.

4         THE COURT:  Yeah.  And so now it's kind of, I just

5    need to have an understanding about how an ex-member could be

6    taking acts in furtherance of the conspiracy.  Maybe he was.

7    Maybe he wasn't.  I don't know, but I'm just asking for

8    explanations.

9         MR. LEACHMAN:  Most likely the conspiracy goes back

10   to when he was a member.

11        THE COURT:  And so all I'm asking -- at this point,

12   guys, I know nothing about the facts of the case, so you'll

13   have to educate me about those.  Thanks.

14     (Open court.)

15        THE COURT:  With regard to the motions to sever, I'll

16   wait for responses from the government and those are taken

17   under advisement.

18        So the next set of motions are motions for statements

19   or confessions of any defendant, docket number 729 and 739

20   filed by attorneys Campion and Jeb Lock.  The movants rely

21   upon Bruton and they move the Court to order the government to

22   produce for in camera inspection any statements or confessions

23   made by any defendant which the government intends to use at

24   trial.

25        What's the government's response?

1          MS. PLAYTON:  Well, we have provided full discovery

2   in this case.  Everything, all of the wires, all of the

3   interview statements have already been provided.  So I don't

4   know if there is something specific that they are seeking,

5   or -- you know, at this point, I'm not sure, they are asking

6   for codefendants, we don't know exactly who is going to be set

7   for trial and under what circumstances which statements would

8   be relevant, so I would ask the Court either to deny it at

9   this time as premature, or to defer it.

10          THE COURT:  Mr. Campion or Mr. Lock, do you believe

11   that there is any current statements or confessions that you

12   have not received?

13          MR. CAMPION:  None that I -- I'm not aware of any

14   that I have not received.  Although, I think, as Miss Playton

15   has referenced, there are extensive wiretaps in this case,

16   and, of course, that could give rise to, I mean, just an

17   untold amount of statements of codefendants.

18          THE COURT:  So, I mean, speaking globally to all the

19   defense counsel, have y'all not received the wiretaps?

20          MR. CAMPION:  I believe we have, your Honor.  And

21   that goes to the issue we've raised, as far as the inability

22   to cross-examine those witnesses, should they choose not to

23   testify.

24          MR. DOMBART:  Judge.

25          THE COURT:  Yes.

1          MR. DOMBART:  I would say there is a correction also,

2    because there was a recent email that said that there were

3    some additional phones that are at the FBI office and we need

4    to contact the agent at the FBI to review those phones.

5          THE COURT:  Okay.  One second here.  And so when

6    anybody starts speaking, identify yourself for the court

7    reporter.

8          I'll get to additional discovery that may or may not

9    be missing here in a minute.  I want to go back just to the

10   confessions and the statements.

11         So, Mr. Lock, are you missing anything?

12         MR. LOCK:  Not that I know of, Judge.

13         THE COURT:  Mr. McCrum?

14         MR. McCRUM:  Judge, you asked all counsel as to

15   whether or not, we are talking about just wiretap, as far as

16   Bruton, I think we should see any confession made by any

17   codefendant that may be the subject of a Bruton motion, and so

18   I've not received confessions of codefendants.

19         THE COURT:  Does there exist any by the government --

20   or from the government?

21         MS. PLAYTON:  I believe -- before I respond.

22     (Off the record discussion.)

23         THE COURT:  And so I don't want you to identify any

24   confessions by a codefendant, I just want to know whether or

25   not there exist any.

```
 1      (Off the record discussion.)
 2            MS. PLAYTON:  So potentially two, your Honor.
 3            THE COURT:  Okay.  So if there exists two, two need
 4   to be produced.
 5            Mr. Lock.
 6            MR. LOCK:  Your Honor, I would like to make a
 7   correction that I would like discovery -- production of
 8   discovery.  There was a raid on my client's cell.
 9            THE COURT:  We're going to get to that point in a
10   minute.
11            MR. LOCK:  Okay.  I was going to ask for those notes,
12   if they exist.
13            THE COURT:  That's another item.
14            So with regard to the motions for statements or
15   confessions of any defendant, docket number 729 and 739, that
16   is granted.
17            Motions to suppress by Ricky Escobedo, docket number
18   777, Mr. Mulliner's motion.  And this is a motion to suppress
19   due to illegal wiretapping?  Is this related to the cell
20   search, or are you talking about something else now?
21            MR. MULLINER:  No.  This motion is referring to the
22   tap, to the fact that he was not the subject of a wiretap.
23            THE COURT:  So these wiretaps were pre-existing the
24   cell seizure?
25            MR. MULLINER:  Yes, sir.
```

1          THE COURT:  We're going to hear that at a separate

2    time.  We'll hear that on April 3rd.

3          MR. MULLINER:  Yes, sir.

4          THE COURT:  Then now to the cell search.  Motion to

5    appoint special master, motion for rehearing regarding

6    protective order, omnibus motion on prosecution's

7    exploitation, motion for judicial notice, and motion to

8    suppress, docket number 711, 714, 732, and 733, filed

9    primarily by Michael Morris, Economidy, and Cazier.

10          Let's go through the facts first of what happened

11    here, so I can have an understanding about happened.  So what

12    caused the government to believe that the protective order was

13    violated?

14          MS. PLAYTON:  We were receiving information from

15    various attorneys that individuals --

16          THE COURT:  Attorneys in this case?

17          MS. PLAYTON:  Yes, defense attorneys in this case.

18    That defendants in this case were in possession of documents

19    that were provided in discovery.  We heard that on more than

20    one occasion from more than one person.

21          Additionally, a separate correspondence from jail,

22    from an individual who is a Texas Mexican Mafia member who is

23    in the Bureau of Prisons, not in Geo, there was correspondence

24    intercepted that indicated that they were in possession of

25    documents related to, you know, source information.

1          THE COURT:  Let me stop you here.  So this other

2   alleged Mexican Mafia member in a BOP prison --

3          MS. PLAYTON:  Yes.

4          THE COURT:  -- he was in receipt of documents subject

5   to the protective order?

6          MS. PLAYTON:  He was receiving information from

7   individuals in Geo in this case from the documents that were

8   the subject of the protective order.

9          THE COURT:  So that other person didn't actually have

10  the documents, but he had the information that was contained

11  in the documents?

12         MS. PLAYTON:  Yes, correct.  And was communicating

13  about that.

14         THE COURT:  And so whose cells were searched?  Were

15  all the defendants in this case cells searched?

16         MS. PLAYTON:  Yes.  That information was provided to

17  the facilities and they, the facilities themselves, conducted

18  a search.

19         THE COURT:  And so let's talk about how the search

20  was conducted.  Was it just of the cell or was it the physical

21  bodies of the defendants themselves?

22         MS. PLAYTON:  I believe it was just the cell.

23         THE COURT:  And so --

24         MS. PLAYTON:  That is our understanding, yes, your

25  Honor.

1      THE COURT:  And so who conducted the cell search?

2  Was FBI agents conducting the cell search?

3      MS. PLAYTON:  No, it was the facility.  So it was

4  Guadalupe County and Geo.

5      Those two facilities?

6      UNIDENTIFIED FEMALE SPEAKER:  And Wilson.

7      MS. PLAYTON:  And Wilson.  And the actual jail

8  administrators, the people who do that, conducted the

9  searches.

10      THE COURT:  Okay.  And documents were seized, I'm

11  told, from Raul Ramos' cell, Robert Cantu's cell, Richard

12  Gamez's cell, Arthur Gallegos' cell, Richard Escobedo, and

13  Alfred Garansuay, and Albert Guerra Mata's cell.

14      MS. PLAYTON:  That's correct.

15      THE COURT:  Were documents seized from any other

16  cells?

17      MS. PLAYTON:  Yes.  This is how -- my understanding,

18  of how it was conducted.  The jail administrators were advised

19  of the information that we had about documents, government

20  documents and discovery being inside the facility.  The jail

21  facility then did their own search.

22      DEFENSE COUNSEL:  Excuse me, Judge?  Could she speak

23  at the mike, please?

24      MS. PLAYTON:  Once they did the search, they took out

25  documents -- and as your Honor knows, they were clearly marked

1    government documents.  They took out documents and placed them

2    in bags identifying who those documents belonged to.  And they

3    were then placed in a separate conference room so that members

4    of what is referred to as the taint team, agents who are not

5    agents in the prosecution team, then went into those rooms,

6    looked through those bags, and any item that appeared to be

7    either a 302, a line sheet, or some document that referred to

8    the case and source reporting, was then segregated and

9    provided to the taint attorney Karen Norris.

10          And then items that were clearly not related or

11   relevant, like drawings, or personal letters, or something

12   that was clearly unrelated, was then returned to the jail

13   staff.

14          THE COURT:  So documents that had nothing to do with

15   this case that were completely personal in nature were

16   retained -- were returned to the individual defendant?

17          MS. PLAYTON:  They were returned to the jail staff.

18   The agents, who are members --

19          THE COURT:  Well, let's talk about what happened to

20   the stuff though.  So did the jail staff give it back to the

21   defendant?

22          MS. PLAYTON:  I don't know what their procedure was.

23          THE COURT:  So we don't know that yet?  Okay.

24          MS. PLAYTON:  No, your Honor.

25          THE COURT:  Was any other contraband seized from the

1   cells other than documents?

2          MS. PLAYTON:  Yes.  There were four cell phones --

3          Is there a shank?

4          -- and several shanks.

5          THE COURT:  Okay.  And what happened to the cell

6   phones?

7          MS. PLAYTON:  Those were turned over to the FBI, a

8   search warrant was obtained and signed, and those phones are

9   being searched.

10         THE COURT:  By the taint attorney, or by who?

11         MS. PLAYTON:  By the FBI, the trial team.

12         THE COURT:  So if --

13         MS. PLAYTON:  So those would be contraband.  Those

14  cell phones, they are not -- they were hidden.  So there are

15  actual telephones in these cell blocks, and apparently the two

16  cell phones were hidden behind one phone, and then another two

17  were hidden behind the other public phone that they are

18  allowed to use.

19         THE COURT:  Okay.  So the government is representing

20  that the seven individuals had documents seized from them.  Is

21  anybody else among the defense counsel claiming that documents

22  were seized and still improperly held?

23         MR. SWITZER:  May it please the Court.  My client

24  informed me that notes that he had prepared for me, not

25  protective documents, were seized, and I presume are being

1  examined by the taint team.

2          THE COURT:  I'm sorry who is you're client?

3          MR. SWITZER:  Julian Rosas Garza, your Honor.

4          THE COURT:  Anybody else claiming documents?

5          MR. CAZIER:  Your Honor, Allen Cazier for Ramiro

6  Carrizales.  We will proffer and offer evidence that personal

7  notes of Mr. Carrizales were seized and have not been

8  returned.

9          MR. McHUGH:  Your Honor, defendant number 37, Marc

10  Reyes.

11          MR. MULLINER:  Your Honor, Jeff Mulliner for attorney

12  number 10, [sic],  Ricky or Ricardo Escobedo.  We are

13  suggesting that a single sheet of notebook paper and nothing

14  that was subject to the protective order was seized

15  unlawfully.

16          THE COURT:  We got you covered.

17          MR. MORRIS:  I'm assuming you have me covered as

18  well.  Mike Morris, your Honor.

19          THE COURT:  I've got Mr. Morris, Economidy, and

20  Cazier I've got covered.  I'm asking about anybody else.

21          MR. CANTRELL:  Your Honor, Anthony Cantrell, for

22  number 11, Jimmy Lee Zuniga.  After conferring with my client

23  yesterday, he did express to me that information that he had,

24  questions for me, clearly attorney/client privilege

25  information, was seized and had not been returned to him at

1  this time.

2         MR. LOCK:  And Judge, Jeb Lock for Arturo Garcia

3  Bernal.  Same situation.  He told me this afternoon that there

4  were notes that he made in connection with this case with

5  questions he had for me that were seized and have not been

6  produced or given back to him.

7         MR. GARZA:  Your Honor, Ed Garza on behalf of

8  defendant number 19, also the same situation.

9         MS. PLAYTON:  What's defendant 19's name?

10         THE COURT:  Hold on.

11         MS. ACEVEDO:  As to number 36, Jose Luis Cortez, same

12  exact situation, Judge.  In conferring with my client he said

13  that items that were specifically meant for me were seized and

14  not returned.

15         THE COURT:  I'm sorry, what's your client's number

16  again?

17         MS. ACEVEDO:  Thirty-six.

18         THE COURT:  Thirty-six.  Thank you.

19         MR. HUDSON:  Brandon Hudson for Angel Cantu Garcia,

20  number 3.  He had some personal notes.  I'm not sure what the

21  content of them was, other than there were some litigation

22  issues that he and I were going to discuss.  That's all I

23  know.

24         MR. GUYER:  Robert Guyer for Richard Gamez, your

25  Honor.  If you called our name, I didn't know.  But, yes, we

1  had personal items taken, and they were notes from

2  attorney/client conferences.

3          THE COURT:  And that's number 7.

4          MR. DISRUD:  Jon Disrud.  I represent Albert Guerra

5  Mata, and personal notes were seized from my client as well.

6          MR. VELA:  Good afternoon, your Honor.  Daniel Vela,

7  on behalf of number 6, Fernando Gonzales.  There are personal

8  items, personal notes, that he had also in his possession that

9  he wanted to talk to me about.  I don't know the content, but

10 they are definitely between the attorney and client, your

11 Honor, and should be returned to him.

12         MR. McDONALD:  Terry McDonald for Robert Cantu,

13 number 4.  He was mentioned by you when you called out the

14 names, and we would like the matters that were seized to be

15 examined and those to be returned.  They have not been

16 returned yet.

17         MR. ECONOMIDY:  John Economidy, your Honor, on behalf

18 of number 8.  I have some problems with representations made

19 to the Court.  The representation was that basically Geo did

20 the searches.

21         THE COURT:  Yeah.  So I'll give you a chance to

22 respond.

23         MR. ECONOMIDY:  Okay.

24         THE COURT:  Let me get at least one side of the

25 version and then I'll ask somebody to respond.

1        So we have documents seized.  The government is

2   contending that some that were clearly not relevant to this

3   case and personal in nature were given back to the facilities.

4   We don't know what the facilities have done to those

5   documents; correct?

6        MS. PLAYTON:  That's correct, your Honor.

7        THE COURT:  And then with regard to the documents

8   that were seized and they were given to Miss Norris,

9   Miss Norris is reviewing them to see what they are, she makes

10  a determination that some documents were documents that could

11  potentially have been subject of the protective order, and so

12  where do we stand now?  And I'm not sure if I should, you

13  know, get Miss Norris to come up here now, but what happened

14  physically with these documents at this point?

15        MS. PLAYTON:  So once the taint review agents had the

16  documents sorted out, they provided them all to Karen Norris.

17  Items that were not a part of this case and were not relevant

18  were returned to and left with the jail staff.  Miss Norris

19  then, and she will need to tell you more about -- she's

20  already reviewed everything.  The majority -- I mean, there is

21  like 900 pages, I believe over 600 are government documents,

22  302s, line sheets, just straight out of our discovery, source

23  reporting.

24        Then there are other documents that she has

25  segregated out where she, if she thought it was clearly

1    privileged, and clearly not a government document and not

2    relevant to the Court's protective order and not placing

3    anyone in jeopardy, she reached out to the lawyers -- and I'll

4    have her talk to the Court, and she may need to do this at the

5    bench outside my hearing so that I don't hear the contents of

6    any of those documents that she reviewed, she reached out to

7    the lawyers and that is how they -- they then filed this

8    motion because she went through that procedure of reaching out

9    to them.

10           Documents that were potentially privileged -- so

11   there is three categories, not privileged, government

12   documents, line sheets, source reporting, things that we gave

13   them.

14           The second items would be things that appear to be

15   privileged and not related to the protective order, so any

16   attorney/client communication or things like that, she reached

17   out to the lawyers and returned some items to some lawyers.

18           And then the third category is the category in the

19   middle where your Honor may be called upon to review and make

20   a decision, and those are documents that may be privileged but

21   may also be in violation of the protective order.

22           THE COURT:  So, Miss Norris, without making any

23   references to the prosecution team, I don't want to know about

24   content, I want to know about process.  So you received

25   950-something pages?

1          MS. NORRIS:  It was something like that.  I don't

2   have that number right in front of me, but, yes, I received a

3   large number of documents but they were segregated by the cell

4   from which they were seized, the defendant in that cell.  So

5   they were in batches.

6          THE COURT:  And so how many of the 950 or so

7   documents have you and the defense lawyers ultimately reached

8   agreement upon and you gave them back to them saying this was

9   privileged?

10         MS. NORRIS:  So what I did, your Honor, is after I

11  finished my review, and I believe it was February 13th, I sent

12  each defense counsel an email saying who I was, what I had

13  done in the case, and then I provided them with an index of

14  the documents that have been seized from their client's cell,

15  you know, with a brief description of what the document was

16  and then what my initial categorization, privilege, not

17  privilege, et cetera.

18         In that email I told them that if they wanted to

19  review any of the documents, they could make an appointment

20  and come by.  I told them that any documents that I had found

21  to be privileged, upon request I would return to them.

22         And if they wished to assert privileges to any

23  documents listed, to let me know by February 27th, and so I

24  received correspondence from some of the attorneys asserting

25  privileges, and when I received that correspondence I went

1  back through the index and marked it so they were clearly

2  identified that a privilege had been asserted, and I returned

3  documents to some of the counsel who asked for it.

4       Some of the counsel I had no communication from at

5  all, so...  And we have done nothing with the documents

6  pending this hearing, so...

7       THE COURT:  So, for an example here, documents that

8  were seized from Mr. Garansuay, I was tendered a package that

9  these were the documents from Mr. Garansuay.

10       MS. NORRIS:  Correct.

11       THE COURT:  With regard to the other six that

12  documents were seized from, I don't have any such package.

13       MS. NORRIS:  I tendered those documents to the Court

14  upon the Court's request.  I also informed Mr. Morris that I

15  had done that, so he knew exactly what my correspondence was

16  with the Court and what I had tendered to the Court.

17       There were some instances where, you know, the

18  documents were not privileged.  It might have been a copy of a

19  docket sheet, or something like that.  And in those cases, it

20  didn't particularly surprise me that defense counsel didn't

21  reach out to me.  It wasn't anything of any significance.

22       THE COURT:  Well, where I'm heading with this is out

23  of the 950-something pages that you saw, it appears that 600

24  something of them were discovery materials that are clearly

25  not privileged.

1      MS. NORRIS:  Correct.

2      THE COURT:  So the math says there are 300-something

3  documents that I need to review, and so I don't have 300

4  documents.  That's my question.

5      MS. NORRIS:  Okay.  Some of the documents that were

6  not tendered to the Court would have been the ones that were

7  marked as clearly attorney/client privilege.  In the case of

8  Mr. Economidy, I gave him those back, so they are not at

9  issue, you know.

10      THE COURT:  So how many of those --

11      MS. NORRIS:  I can get the numbers for you.  I don't

12  have them in front of me.  And then as to other documents that

13  were not privileged, you know, again, I didn't tender those to

14  the Court.  I can tender everything to the Court.  The Court

15  didn't request that, so we didn't want to --

16      THE COURT:  You know --

17      MS. NORRIS:  -- put 900 pages --

18      THE COURT:  -- apparently there's a miscommunication.

19  So I don't want to see 950 pages, because I don't need to see

20  950 pages, because if 600 and something of them were just

21  discovery materials, that's clearly not privileged.  But then

22  with regard to the 300, and I'm just making up numbers because

23  I don't know the actual numbers, but with regard to the 300

24  numbers, I need to see those pages to figure out, well -- let

25  me backtrack.

1    With regard to those 300 pages, if any of those 300

2    pages were clearly sent back to the defense counsel and given

3    back, and you all are agreeing that it's attorney/client

4    privileged, and you're not passing that to the prosecution

5    team, I don't need to see those either.  So whatever the

6    difference is, I need to see.

7        MR. McHUGH:  I'll be happy to send them to you.

8        THE COURT:  Okay.  Now that we have somewhat of an

9    idea about what happened factually, let me hear from

10   Mr. Economidy as to disagreement on what the government

11   purports to be the facts.

12       MR. ECONOMIDY:  Thank you, your Honor.

13       Let's start with the basics.  Number one, the

14   individuals were not in cells.  They were in pods, where maybe

15   20, 25 people are in there at a time.  They are assigned a

16   bed.  They are not assigned a specific locker.  The lockers

17   are unlocked.  Anyone can put something in any locker.

18       The items that were taken were not taken by Geo.  I

19   have talked, and I'll represent to the Court that the

20   individual that I talked to was Assistant Warden David Seals.

21   He said, "We had nothing to do with this.  We did not collect

22   anything.  FBI called U.S. Marshals, U.S. Marshals called me,

23   we had nothing to do with collecting of the evidence."

24       Secondly, if you go to Mrs. Norris' statement, which

25   is attached, I believe it's Exhibit 3 to my omnibus motion, it

1   specifically states that FBI collected these items and did the

2   search.  So I think there is some problems here on who

3   actually collected whatever.  Rather than have someone who

4   wasn't there, such as perhaps a U.S. attorney who may or may

5   not have been there, I think we need more specific stuff.

6           With regards to my client's items that were taken,

7   the items that were taken are actually attached to my omnibus

8   motion, and I think you've seen on my motion that it has a

9   full page privileged and confidential attorney/client

10  communication and confidential work product.  I don't see how

11  anybody, FBI agent or anyone else, could not draw any

12  conclusion but what that is privileged and confidential.

13          THE COURT:  Well, I mean, just because it has a sheet

14  there, I mean, you can't attach a sheet like that to a bag and

15  have drugs in there and claim the whole thing is

16  attorney/client.

17          MR. ECONOMIDY:  At some point you've got to trust

18  your lawyers, Judge.

19          THE COURT:  Well, I mean, but the lawyers weren't in

20  the cell blocks.

21          MR. ECONOMIDY:  Well, we get to talk to our clients

22  over there, you know.  The way it was written, to me, was,

23  hey, you have, Mr. Economidy, put discovery in there, because

24  the eight pages of discovery that was found in the locker

25  where my client had stuff, had nothing to do with him.  His

1  name is not even mentioned in that stuff.

2          THE COURT:  Yeah.  Now, so just so everybody here

3  doesn't get too defensive.  I'm not blaming any lawyer about

4  what happened here.  I mean, just because one defendant might

5  have had these records doesn't necessarily imply that that

6  person's lawyer gave them the records.  I mean, it could have

7  come from some other defendant.

8          MR. ECONOMIDY:  That's correct.

9          THE COURT:  So I'm not casting aspersions on any

10  individual lawyer, yet.

11          MS. PLAYTON:  And neither is the government, your

12  Honor, but these documents came from discovery.

13          THE COURT:  No, that's clear.

14          MR. ECONOMIDY:  And I have no doubt they came from

15  discovery, but I'm looking at the deep play, your Honor.  If

16  we get into sentencing on a case, is my client going to be hit

17  with two points or two offense levels for obstruction of

18  justice because someone else put something else in there?

19  That's what I'm concerned with.

20          THE COURT:  And so, yeah, we're putting the cart

21  before the horse.  If someone pleas, if they had these

22  documents, I'm not going to claim that that was necessarily

23  obstruction of justice.

24          MR. ECONOMIDY:  All right, well --

25          THE COURT:  And so the other part about all of this

1  too is, so I'm unclear from what has been provided to me, how

2  many of them were the actual documents?  And some lawyers

3  appeared to have summarized the documents, perhaps just word

4  by word, and maybe it's not even quite a summary, but they

5  took the FBI 302s, or whatever statements, and then put it

6  into another document and put a cover sheet on it saying,

7  here's the stuff that we received and reviewed.

8          MS. PLAYTON:  Your Honor, I can't speak to that

9  because I don't know anything about what the contents of any

10 of the documents are.

11         THE COURT:  Right.  And so Miss Norris does.

12         MS. NORRIS:  So that's a very specific -- that

13 relates to a very specific defendant in this case and I would

14 request that if we're going to address that, that that defense

15 counsel and I come to the bench.

16         THE COURT:  Yeah.  So, you know, all I'm suggesting

17 here is that may or may not have been a technical violation of

18 my order.  I said that attorneys could discuss the

19 documents --

20     (Off the record discussion.)

21         THE COURT:  That's fine.  That one defendant can be

22 excused to go to the bathroom.

23         So where was I?  Oh, yeah.  So I said that attorneys

24 could review the documents with their client, and they could

25 discuss the documents with their client, but they just

1  couldn't physically hand the documents and leave them with the

2  client.  And so someone got creative over here and said, "Oh,

3  so, since we can't leave the documents with the client, we'll

4  go ahead and summarize it or give verbatim, you know, quotes

5  and put it to the client in an attorney/client letter."

6          So my order wasn't so specific to say you can't do

7  that either.  Now, by the way, that order was drafted by the

8  government, so it clearly wasn't my mistake only here.  And so

9  whether that was a technical violation, or, you know, did it

10 violate the spirit of what we were trying to do?  Yes, we were

11 trying to protect confidential sources and the defendants from

12 each other.

13         And so just to make sure we're very clear going from

14 this point forward, gentlemen, and lady, we're going to keep

15 the protective order in place.  You can discuss with your

16 clients the discovery materials.  You cannot, however, give

17 them anything from the discovery materials and leave it with

18 them, and you cannot be circumventing the order by basically

19 writing it down yourself and then passing it that way.  So

20 that would be a violation of this amended protective order.

21 Just so we're clear going forward.

22         So now, Mr. Economidy, I have turned to the exhibits

23 that you referenced, and so the government did say in that

24 email, "Your client's jail cell was searched by the FBI."  So

25 who searched these documents?

1          MS. NORRIS:  So, your Honor, I received the documents

2    from the FBI, and so I just received them from them and I

3    assumed they conducted the search.  I later found out it was

4    as it was described, that they, the people, the employees of

5    Geo, the employees of Guadalupe County Jail, Wilson County

6    Jail, did the search, and then turned it over to the filter

7    attorneys -- or the filer agents, which is who I received the

8    documents from.

9          THE COURT:  Well, we sill have Mr. Economidy's

10   telephone call with one of the wardens there at Geo who is now

11   disavowing --

12         MS. PLAYTON:  Your Honor, my proffer is with

13   witnesses present in court who can be subject to

14   cross-examination.  I don't know if Mr. Seals is present in

15   court.  I've never spoken to him, but the representation I am

16   making to you today, the proffer is something that I am able

17   to back up.

18         THE COURT:  Okay.  So, now, who actually conducted

19   the search may not be legally relevant.  So let me allow you

20   to continue, Mr. Economidy.

21         MR. ECONOMIDY:  Another area I have a problem is:

22   Why is there this 51-day delay from time of seizure until the

23   time there is review by Mrs. Norris?  I have a great paranoia,

24   I guess it is, that people who work in the same office,

25   whether it's the same FBI office, or in the same U.S.

1   Attorney's Office, aren't talking to each other.

2          It's commendable that they have silence, but if you

3   see leaks out of the White House and out of Congress, you know

4   people talk.  In my particular case, on what I'm going to

5   describe it as the review sheet --

6          Correct me, if that's the wrong terminology.

7          MS. NORRIS:  The summary of the arguments?

8          MR. ECONOMIDY:  The summary.

9          In the review sheet, which is attached to my omnibus

10  motion, I think it's the third item, and it refers to, "This

11  is not privileged because of a telephone call with

12  Mr. Economidy."

13         Well, the telephone call went to David Shearer, which

14  is the prosecution.  So you have a mixture of the taint

15  attorney, reviewing attorney, and the actual prosecution

16  attorney.  So when I see that in there, it makes me think

17  there is not total silence in this particular case because

18  they are quoting David Shearer.  They are not using his name,

19  but the only person I made a phone call with that was with

20  David Shearer.

21         I also have, and have not tendered to the United

22  States, the email exchange which we have on that conversation.

23  So, you know, I'm just not real trustworthy that this didn't

24  get back into whoever is going to prosecute this case.

25         MS. PLAYTON:  I would just remind, this is the same

lawyer who told you moments ago "You have to trust your
lawyers."  So, you know, of course I talk to Miss Norris, but
we have not spoken about the contents of those documents, and
neither has Mr. Shearer.  And I think that's what's important.

THE COURT:  And so what's also important factually
now, I'm trying to figure out, so 950-some odd pages were
taken, but right off the bat we take away 650 or so because
there were the discovery materials, so I'm actually trying to
figure out, what exactly are we fighting about?

Out of the 300-some odd documents, and some of them
were returned to you all, does the government -- well, where
are we at between the taint attorney and the prosecution team?
How many of these documents does the government actually want
to use at time of trial, if we go to trial?

MS. PLAYTON:  First, as it relates to the actual 302s
and the line sheets --

THE COURT:  No.  No.  No.  No.  No.  All of that is
discovery.  All of that probably will come into trial.  I know
that.

MS. PLAYTON:  I'm not aware of any that -- I mean,
look, I've never seen the documents, so how could I evaluate
whether I'm going to use them?  Clearly, if they are
conversations about, you know, the lawyer/client
communications, I don't know that I'm entitled to use them nor
do I ever anticipate using them.

1          THE COURT:  And what about the notes that were taken?

2          MS. PLAYTON:  I don't know of any notes that were

3    taken.  Are you talking about the ones that were not -- the

4    people who did not receive notification?  Oh, notes by the

5    lawyer?

6          THE COURT:  No.  So there were some documents seized

7    from some of the defendants that are their personal notes.

8    And the argument, as I understand it is, even though they are

9    not attorney/client privilege they could violate their rights

10   to not self-incriminate themselves, because in their notes

11   they're, in so many words, basically agreeing to their part in

12   the Hobbs conspiracy or the drug conspiracy, and so, I mean,

13   I'm trying to get to the nub of this.  Are we fighting over

14   nothing, or is the government actually intending to use some

15   of that stuff?

16         MS. PLAYTON:  Your Honor, okay, I don't know that any

17   of those types of things exist, number one.

18         THE COURT:  So assume with me that those things

19   exist.

20         MS. PLAYTON:  I do not -- unless there is a threat or

21   some sort of plan to try to harm somebody or obstruct justice

22   in some way, we do not intend to use personal notes or

23   anything like that.

24         THE COURT:  Now, let me just give you a hypothetical.

25   Defendant number X wrote in his cell, you know, "I joined the

1  Mexican Mafia here.  I'm going to always be a member. I'm

2  proud of all the drugs that we made and the amount of money we

3  got out of the dime."  Let's just say that's the hypothetical.

4         Do you intend to use that at time of trial against

5  that defendant?

6         MS. PLAYTON:  I mean, well, of course, I would want

7  to use something like that, but I don't know if it exists.

8         THE COURT:  Right.  So then we have to go through the

9  legal analysis.  So while I've got you up here, Mr. Economidy,

10  I mean, so you wrote a lot, and I appreciate your comments

11  about the Trump Administration, but they are kind of

12  irrelevant to here.

13         MR. ECONOMIDY:  Merely demonstrating.

14         THE COURT:  Yeah.  Well, you know, but you didn't

15  cite to me any law.  So, I mean, where does a pretrial

16  detainee have a reasonable expectation or privacy that I must,

17  you know, give acknowledgment to?

18         MR. ECONOMIDY:  Well, he doesn't have a right of

19  privacy under Fourth Amendment.  I've cited those case in my

20  omnibus motion.

21         THE COURT:  Does or does not?

22         MR. ECONOMIDY:  Does not.  Does not.

23         THE COURT:  Right.

24         MR. ECONOMIDY:  But we're not basing our argument on

25  the Fourth Amendment.  We're basing our argument on the Sixth

1  Amendment right to effective assistance of counsel.  What this

2  case has done has basically drawn a wedge right between me and

3  my client.  And I'm not happy about it.

4       THE COURT:  Let me talk to you about that.  So the

5  denial of the Sixth Amendment, effective counsel, I mean, I'm

6  letting you show the documents to your client.  I'm letting

7  you guys talk about the documents.  Nothing is prohibited

8  there.  The only thing I'm prohibiting is letting you leave

9  the document with your client.  So how is that denying your

10 client effective counsel?

11      MR. ECONOMIDY:  He doesn't have that degree of

12 assurance that what I do in my case is not a part of the

13 government's operation, rather than a loyal defense attorney

14 who has vowed to give him a vigorous defense.

15      The other part is, is that we have, basically I want

16 to call it a Chinese Wall.  I don't think they can create a

17 Chinese Wall through a review attorney.  The law that I read

18 is that you adopt the law of the forum.  And that came out in

19 RE:  Itron, I-T-R-O-N, Fifth Circuit, February 21st of this

20 year.

21      Now, I don't know if that was a diversity case.  When

22 I read it, I can't determine that, but it talks about when you

23 use conflict laws and ineffective assistance of counsel, then

24 you're going -- the Chinese Wall concept, you're going to

25 apply local state law.  And under Texas law, *Petroleum*

1  *Wholesale versus Marshall, 751 S.W. 2d 295, 299, 300, Texas*

2  *Appeals, Dallas, 1988*, there is a conclusive presumption that

3  the attorney who has got the confidential information has

4  shared it with other individuals in their office.

5       THE COURT:  Those are all civil cases?

6       MR. ECONOMIDY:  That particular case is a civil case.

7       Now, I can give you a criminal case, and that, to me,

8  is *Arizona versus Roberson, 486 U.S. 675, 1988*.  It's not

9  really a Chinese Wall case, but it is a case of a defendant

10  exercises his right, I can't remember whether it's silence or

11  to an attorney, to one set of police, and then the second set

12  of police came in and did the same thing and he did not assert

13  his rights then.  And the Supreme Court says you're tainted.

14  Once you have asserted your right with the first group, the

15  second group is tainted.  Now, that's the closest that I can

16  get by analogy.

17       THE COURT:  So, if you can, you are welcome to submit

18  a letter brief to me and see if you can distinguish these

19  cases.  One is called *Jarmin, J-A-R-M-I-N, 847 F.3d 259*.  It's

20  out of the Fifth Circuit, this last year, 2017, and it seems

21  to allow these taint counsel.  So please take a look at that

22  case and see if you can --

23       MR. ECONOMIDY:  I'll be glad to.

24       Now, what I have done is I've gone through the U.S.

25  Attorney's Manual and through the U.S. Attorney's Criminal

1  Resources Manual and I see no authority for it there

2  whatsoever.

3       THE COURT:  As you know, I'm bound by the Fifth

4  Circuit, so if you can take a look at that case and see how

5  you can distinguish it.

6       Now, if he has no expectation of privacy under the

7  Fourth Amendment and you are relying upon the Sixth Amendment

8  right of counsel, are there any other issues that you are

9  concerned about that you --

10      MR. ECONOMIDY:  I think the whole thing is outrageous

11  government conduct, which violates the Fifth Amendment due

12  process clause.  So I have two prongs of the Constitution that

13  are applicable here.  Now, I'll be the first to admit, there

14  is very few cases that have actually found outrageous

15  government conduct, other than the one Supreme Court case

16  thirty years or so ago.

17      THE COURT:  Now, assume with me, you know, so we have

18  the protective order, so some of the discovery material was

19  not to be left with the defendants.  So isn't that contraband?

20      MR. ECONOMIDY:  In my judgment, absolutely.  The only

21  place where I have a gripe is they are taking my confidential

22  stuff, which is clearly marked privileged and confidential.

23      THE COURT:  Okay.  Any last words?

24      MR. ECONOMIDY:  No, sir.

25      THE COURT:  Thank you, sir.

1          MR. ECONOMIDY:  Thank you, sir.

2          THE COURT:  Anybody else here who filed that motion

3    want to -- Mr. Morris.

4          MR. MORRIS:  Thank you, your Honor, may I?

5          THE COURT:  Yes.

6          MR. MORRIS:  As the guilty party who kicked the ant

7    bed initially, I had two things that I was asking for in my

8    motion.  Number one is appointment of a special master so that

9    your Honor doesn't have to be the one to conduct this review.

10         And, number two, to remove that evidence out of the

11   AUSA's office, because, quite frankly, they are subject to the

12   same rules that all of us are.  The Texas Rules of

13   Disciplinary Procedure do not allow one attorney in an office

14   and another attorney in office to pretend to not be in the

15   same office.

16         THE COURT:  So, you know, let me give you -- if you

17   didn't take it down, help me understand what's the difference

18   with *Jarmin, 847 F.3d 259*, and then a case out of the Southern

19   District in Houston, *2006 Westlaw 1881370*, and they both seem

20   to allow for taint teams.  So, I mean, I'm not sure how they

21   were doing that.

22         MR. MORRIS:  I don't know either.  I'll have to take

23   a look at that for you, your Honor.  All I know is 28 U.S.C.

24   530(b) says they play by the same rules as every other Texas

25   attorney, regardless of the fact we're in federal court,

1   regardless of the fact they are jurisdictionally under the

2   authority of the Department of Justice.  The fact is, they are

3   Texas attorneys in Texas, and Chinese Walls have not been

4   permitted since quite a ways back.

5           THE COURT:  And so that's --

6           MR. MORRIS:  Primarily in civil cases.

7           THE COURT:  I know that's the case in civil cases,

8   but what happens in criminal cases?

9           MR. MORRIS:  Because nobody has ever done it, quite

10   frankly.  And I'm going to go look at the cases you're

11   referring me to, but when we're digging through the records,

12   we're not finding instances where people at the Fifth Circuit

13   are jumping up and down and saying, "Wait a minute, half of

14   our office is reviewing this and half of them aren't."

15           And when you hear testimony about "We're going to

16   hand you back your privileged documents," well, welcome to

17   2018.  They have scanned them.  They have copied them.  They

18   have analyzed them.  They are in a database there at the

19   office of the U.S. Attorney's.

20           THE COURT:  We don't know that.  Miss Norris is

21   shaked her head no.

22           MR. MORRIS:  Okay.  Sure.

23           So my other problem then is, I have clients who are,

24   as you are going to see when you open that packet, probably

25   the most educated clients in any case.  I put myself in that

1  box and I say, "If it was me sitting at that cell, what would

2  I want to review?"  Your question to Mr. Economidy was, "How

3  is it that this protective order allowing you to go sit and

4  pass mail through a slot about that thick and talk through a

5  piece of glass about that thick, isn't sufficient basis for

6  them to understand the evidence in this case?"

7          THE COURT:  So, I mean, if you wanted to actually

8  leave it with them, then why did you wait six months?  Why

9  didn't you file a motion with me saying, you know, "I want

10  relief from this protective order."  Why did we wait all this

11  time?

12          MR. MORRIS:  We have done that in other cases and

13  have been frustrated, to some degree, in the ability to

14  provide that because of the concerns the court has.  I will be

15  the volunteer to tell you I was the creative attorney who said

16  "I'll summarize what I see."

17          But my client has explained to me, he needs more than

18  an hour once a week to sit there and go through the evidence.

19  He needs to digest it, think about it, figure out what his

20  problem with it is, or his acceptance of it is.  He needs more

21  than just time with me.

22          THE COURT:  And so how do I balance -- I mean,

23  because there was purportedly -- and I'm not saying your

24  client did it, I don't even who did it -- but purportedly

25  there was a leak outside Geo, and Wilson, and wherever else

1  everybody is being held, to another BOP facility and there was

2  a disclosure made about who was an informant.  I mean, so how

3  do I strike this balance about protecting informants?  And so

4  how do I do this?

5         MR. MORRIS:  Absolutely.  And that's what --

6  Mr. Economidy and I have had discussions about this, because

7  there is a legitimate concern there.  Nothing of what my

8  client possessed was an actual BOP record or something, DEA

9  record or something, a 302, he had none of those.

10        In jail parlance, that is gospel.  When you've got

11 the DOJ's signature at the top, that's what happens.

12 Something an attorney writes, I think, falls far, far below

13 that in its ability to communicate to somebody at another

14 facility at some other relationship to the Texas Mexican

15 Mafia, but there is never anything this Court can do to stop a

16 defendant here from talking to somebody in their family who

17 calls somebody at the BO -- the relaying of information, which

18 is all you heard evidence about, that was all the proffer was,

19 is the relaying of information, not discovery, not actual

20 records, just the relaying of information.  You can't stop

21 that.  Now, one mechanism --

22        THE COURT:  Hold on.  I'm going to make sure I

23 understand what you are saying.

24        So, Ms. Norris, other than the synopsis, I mean, was

25 any actual discovery document found among these seven cells?

1        MS. NORRIS:  There were 302s.  There were line

2   sheets.  There were confidential human source reporting

3   documents.  There were a lot of documents that were the copies

4   of the original government documents.  Not in this particular

5   case.  And again, you know, we can talk here.  We can talk in

6   camera about this specific case with Mr. Morris, or at the

7   bench, whatever the Court wants --

8        THE COURT:  Yeah, no.

9        MS. PLAYTON:  -- because there is some clarification

10  that I need to get into on that.

11        THE COURT:  And thank you.

12        So I just want to make sure I understand what

13  Mr. Morris did, is he just made synopsizes.  But the

14  government's representation is actual documents were found in

15  the cells?

16        MS. NORRIS:  Yes.

17        THE COURT:  Okay.

18        MR. MORRIS:  Right.  And I didn't mean to

19  misrepresent.  Not found at the BOP.

20        THE COURT:  Right.  No, these cells.  Yeah.

21        MR. MORRIS:  They didn't move this from here to the

22  BOP.

23        THE COURT:  You know, it's a balance.  So I was

24  saying, you lawyers, you can show the documents to your

25  clients, because I understand you have to talk to them about

1   what the evidence is in this case, or the alleged evidence,

2   and you need to show that to them.  And so I wanted to make

3   sure that you were able to do that.

4          MR. MORRIS:  Yeah.

5          THE COURT:  And I wanted to make sure that you were

6   able to talk to them about that.  But, again, this Sixth

7   Amendment ineffective assistance, I mean, if you could show it

8   to them and talk to them about it, how is it a violation of

9   the Sixth Amendment?

10         MR. MORRIS:  And to some degree, your Honor, it's an

11  issue of practicality.  We did an analysis of the number of

12  megabytes that are produced to us in discovery just in this

13  case.  And what you're looking at is about four or five

14  40-hour weeks in order for a defendant to see every piece of

15  evidence produced by the government in this case.

16         Is the Court telling us, to everyone here, "You must

17  go and spend four 40-hour weeks at Geo, so that your client

18  can be educated enough to make a decision in this case

19  regarding the evidence there?"  Surely not.

20         THE COURT:  Well, no.  The answer is you need to

21  spend a reasonable period of time to confer with your client

22  so they can make meaningful decisions about their case.  And

23  so now we'll get to gripes about attorney performance here in

24  a little bit, but because some of the defendants here have

25  gripes about how their lawyers have not been spending enough

1  time, but we'll get there in a moment.

2        MR. MORRIS:  Sure.  But that's my problem with the

3  Sixth Amendment.  And that's my client's problem with the

4  Sixth Amendment.  He is not required to --

5        THE COURT:  But good, effective lawyers don't have to

6  repeat 40 hours.  You digest for them in a meaningful way all

7  the evidence that's been assembled against them and you tell

8  them, "Here's the problem points for us, and here are good

9  points for us."

10        MR. MORRIS:  Of course.

11        THE COURT:  And so --

12        MR. MORRIS:  Of course, your Honor.

13        THE COURT:  My order did nothing to do stop you from

14  doing that.

15        MR. MORRIS:  I understand that.  And I'm not saying

16  that somehow everything contained to every other defendant has

17  to be portrayed to every defendant.  I'm not saying that.

18  What I'm saying is every defendant learns differently.  Some

19  learn orally.  Some learn visually.  Some learn by repetition.

20  That's what the protective order prohibits from occurring.

21        THE COURT:  So, again, though, if some of your

22  clients need to see the documents and hold the documents for

23  some period of time, again I go back to my question that I

24  don't think I got an answer, why did you wait until this whole

25  situation arose?  Why didn't you ask me to amend the

1  protective order?

2        MR. MORRIS:  You're right, your Honor.  In this

3  individual case, I could have brought a motion to amend the

4  protective order.  And that is the alternative request we are

5  asking in my motion that was filed.

6        MS. PLAYTON:  The reason why what you are suggesting

7  is important is because part of the reason it came to our

8  attention is that lawyers who are in compliance with your

9  protective order, who are taking the time to review the

10  documents, to parse it down, to find out what is relevant and

11  what their clients probably really need to know, and what they

12  probably don't really need to know, and going through those

13  materials and meeting with their clients, are hearing from

14  their clients, "Wait, why can't I get the line sheets?  This

15  guy over there's got the line sheets.  He's got the 302s.  I

16  want to see that stuff.  Why can't I have them?"

17        And we have heard that several times from several

18  different attorneys, and so that's why this —— the whole

19  reason this is important is not just because of the Court's

20  order, but because we have witnesses and source reporting that

21  we need to protect, and so that's the reason this Court issued

22  the order and why all of the attorneys have been making very

23  strong attempts to comply with it.

24        And so I'm somewhat frustrated.  It seems he's being

25  rather —— seeming as if this is rather nonchalant, but I think

1  this is very important for a variety of reasons.

2         THE COURT:  So what I need to get from the government

3  is I want a response from you-all about the Texas Rules of

4  Disciplinary Procedure and find out whether or not you-all are

5  prohibitive from a taint wall or not.

6         MS. PLAYTON:  No.  It's my understanding, and, you

7  know, I did not find the provision before, but when it comes

8  to government lawyers, it is specifically allowed in the Texas

9  ethics rules.  And it's because it recognizes that the

10  government, by virtue of the fact for it to function would

11  have to be able to sometimes separate out different functions,

12  and so...

13         THE COURT:  I've not seen any of that law, so you-all

14  provide that to me and explain for me why legally the taint

15  separation here is proper.

16         MS. PLAYTON:  And in addition to the Fifth Circuit

17  acknowledging the use of taint teams and upholding its use,

18  there are numerous district courts within the state of Texas

19  that have upheld them.

20         THE COURT:  You can brief that too.

21         MS. PLAYTON:  Okay.

22         THE COURT:  Counsel.

23         MR. SWITZER:  Robert Switzer, your Honor.

24         A point of clarification on the protective order, I

25  discussed this issue of the voluminous amount of discovery

with my CJ representative and he said we could mail disks to
the Geo law library, our client could review them there on the
computer.  Now, what I'm hearing is that this might be
prohibited.

THE COURT:  So I'm not familiar.  That's the first
time I've ever heard that Geo has been willing to do anything
like that.

MR. SWITZER:  Apparently in the last Mexican Mafia
case with attorneys here and our CJA representative, that's
what they did because of this --

THE COURT:  Are you talking about Convery?

MR. SWITZER:  Yeah.  I just didn't want to throw him
under the bus, if it wasn't proper.

THE COURT:  So, you know, why don't you and
Mr. Convery and the government talk, and if that's a possible
work-around -- I don't know whether it is.  In the past Geo
has been very reluctant to allow computers and use in past
cases.  So why don't the three of you all talk.  If Geo is
willing to do that, I'm assuming then Geo becomes the --
retains the CD?

MR. SWITZER:  The CD, it's my understanding, the CD
is not permitted out of the law library.  They can make notes
and presumably handwrite everything out, although it would
take a millennium.  But they could review it on the computer,
so our clients don't have to take our word.

1          And, plus, we aren't going to understand what is

2     important.  They —— I find out so many things that I didn't

3     realize were important for my client when I showed him.  And

4     we can't print out everything because it would be a

5     staggeringly large amount of paper.

6          THE COURT:  So for now, my amended protective order

7     is still in place.  You—all talk and let's get some

8     representation from Geo about what they are willing to do, and

9     if they are willing to do that I'm willing to amend my

10    protective order.

11         MR. LEACHMAN:  Can we speak to that, Judge, because

12    one of the things that's important, and one of the things

13    Mr. Morris said that is absolutely true, is when he said,

14    "These documents are the gold standard to these defendants,"

15    that exactly right, because when they have the 302 with the

16    snitch's name on it, that's when people get killed.

17         And so we are absolutely opposed to whether that goes

18    to them in electronic or in any other form because they can

19    convert that into this very purpose, that the entire reason we

20    go to the trouble of getting these protective orders from the

21    inception.  We would absolutely oppose that, Judge.

22         And just by way of background, in cases like this in

23    other jurisdictions, the answer isn't just a protective order

24    that says that they can't turn documents over to the

25    defendants.  The cases, the other cases said they had to come

1  to the office to review them, that even the lawyers can't have

2  copies of those cases.

3        And we have made accommodations at the front end of

4  these cases in order to give them the opportunity to do that,

5  but the argument is absurd that, "Oh, we've got to sit down

6  and spend four weeks with them."  They clearly don't need to

7  do that.  They are not on every call.  They don't need to hear

8  every single irrelevant thing that doesn't apply to each of

9  their defendants.

10        THE COURT:  Okay.  We're mixing apples and oranges.

11  So with regard to the opposition, though -- and you-all

12  drafted this order, so...

13        MR. LEACHMAN:  I understand that, Judge.  And

14  frankly --

15        THE COURT:  Let me finish.  Let me finish.

16        So if we're allowing them -- we're allowing the

17  lawyers to meet with their clients and show them the documents

18  and allow them to talk to their clients about the documents,

19  then aren't they already taking notes, and so what's the

20  difference between that procedure and letting them use the Geo

21  law library and reviewing the materials?

22        MR. LEACHMAN:  Because the Geo law library has the

23  actual copies of the 302, whether they are scanned in as PDFs,

24  or whether they are given to them as a physical copy.

25        THE COURT:   But they aren't going to print them out;

1   are they?

2            MR. LEACHMAN:  Well, they might.

3            THE COURT:  All I'm asking you—all is just confer

4   with each other with Geo and see if this is a feasible remedy.

5            MS. PLAYTON:  I was just advised, your Honor, in that

6   case Mr. Convery's client printed documents out and they were

7   then distributed.  And, in addition, in that case witnesses

8   were threatened with death.  And so it was not --

9            THE COURT:  So isn't the remedy there just taking out

10  the printer?

11           MS. PLAYTON:  Well, the problem is that Geo can't

12  be -- the people that are there cannot -- they are not law

13  enforcement.  They don't understand what's important, what's

14  not important.  Your Honor entered an order that they can't

15  have these documents.  If you allow them to receive those

16  disks, then you're giving them the documents.  There is no way

17  to control who is with them, who is next to them, who they

18  show it to, and if they print it out.  I don't know that there

19  is anyway to control that.

20           THE COURT:  But my last question was, it poses the

21  same problem with your current draft.

22           MS. PLAYTON:  No.  The current draft says they cannot

23  have the documents.

24           THE COURT:  No.  No.  But it says the lawyers can

25  show them to them.

1          MS. PLAYTON:  Yes.

2          THE COURT:  And it says the lawyers can discuss with

3   them.  So what prohibits them from taking notes right then and

4   there?

5          MR. LEACHMAN:  I've got no problem with them taking

6   notes, because then if they are going to go try and get

7   somebody to put a hit on somebody, they have to give them

8   their handwritten notes, and now it's their word of what was

9   in the documents, it's not a government document.  That's a

10  big difference.

11         THE COURT:  Okay.  So again --

12         MS. PLAYTON:  Because like we're here today, your

13  Honor, we don't know where these documents came from.

14         THE COURT:  I've heard enough.  Thanks.

15         So the amended protective order that I verbally

16  stated is still in place.  You-all are instructed to confer

17  with Geo and the CJRA rep and discuss what, if any,

18  alternatives may be available.  I'm not ordering anybody to

19  adopt it.  I'm saying confer, and if an agreement can be

20  reached, then I'll entertain an amendment to this order.  And

21  if you can't reach an agreement, I'll hear from both sides and

22  we'll figure out what to do next.

23         Counsel.

24         MR. McDONALD:  Yes, Judge.

25         Geo does have access to the DVDs that they can go in

1  the library and review.  I don't know about printing or
2  anything.  My problem is my client is in custody in Guadalupe
3  County, they don't provide that discovery service, so I would
4  request that my client be moved to Geo so he can have equal
5  access to the information that the other defendants have.
6      THE COURT:  Well, at this point, we haven't
7  implemented it at Geo yet.
8      MR. McDONALD:  Well, they have.  I've had cases --
9      THE COURT:  No, but I haven't ordered it in this case
10  yet.
11      MR. McDONALD:  Well, if you do, Judge, would you
12  consider having my client, Mr. Cantu, transferred to Geo?
13      THE COURT:  I'll of course consider it, but I mean at
14  this point not everybody is going to fit in Geo, and I have no
15  control -- I mean, everybody thinks I have all this power; I
16  don't.  And so I cannot tell the BOP where to put prisoners.
17  I just can't.  And if they choose to keep them segregated for
18  whatever safety reasons, I can't do anything about that.  I
19  can make suggestions, but I can't order them to do it.
20      MR. McDONALD:  I'm just relaying my client's
21  concerns.
22      THE COURT:  Thank you.
23      MR. McDONALD:  Thank you, Judge.
24      THE COURT:  Mr. Cazier.
25      MR. CAZIER:  If I may, your Honor.

1          I'm one of the three lawyers that does have a motion
2     on this shakedown issue.  My case is different.  I filed a
3     motion to suppress based on Fifth and Sixth Amendment grounds
4     as to personal notes that were seized from my client.
5     However, I have an email from Miss Norris in which she tells
6     me that she has received no documents from my client, whose
7     name is Ramiro Carrizales, that's defendant number 13.
8          However, I'm requesting an evidentiary hearing so
9     that we can explore, at least, the fact that he did have
10    personal notes, they were case related, they were attorney
11    discussion related, that have not been returned to him.  I can
12    see that they never went to the U.S. Attorney's Office, but
13    they went somewhere, and we would like to have an evidentiary
14    hearing on that.
15         THE COURT:  So, Miss Norris, you gave me nothing on
16    defendant 13.
17         MS. NORRIS:  Because I received nothing on defendant
18    13.
19         THE COURT:  So where was defendant 13 being held?
20         MR. CAZIER:  Geo, seventh floor.
21         THE COURT:  And so, I mean, if they took a bag out of
22    everybody, what happened ––
23         MS. PLAYTON:  They did not take a bag out of
24    everybody.  They took various bags.  They were not –– it was
25    not everybody, is my understanding.

1              THE COURT:  So let me just ask the question this way:

2    Is there a bag on defendant number 13?

3              MS. PLAYTON:  I don't know if a bag by Mr. Carrizales

4    was provided.  I can tell you no documents attributable to

5    Mr. Carrizales are in the government's possession related to

6    that search, and so we don't have any notes that we intend to

7    use.

8              So if he wants to seek to suppress something, we're

9    not intending to offer.  If he has a question about how the

10   jail handled his client's private notes, then I think his

11   remedy is with the jail.  I mean, we don't have them.  We did

12   not seize them.  The jail conducted their search, and if they

13   were ever in a bag in the -- reviewed by the taint team, they

14   were left there because they were not provided to Miss Norris.

15             THE COURT:  So let me get a response from the

16   government on defendant number 13.

17             MS. PLAYTON:  It's document number 732 is his motion

18   to suppress.

19             THE COURT:  Thank you.  So respond to 732, and just

20   state in writing for me what the government's position is.  If

21   you have no documents, then the motion to suppress will be

22   denied as moot, but tell me whether or not you received a bag,

23   and then explore with Geo:  Did they seize anything from that

24   cell?  And, if so, what did they do with it?  And if they have

25   anything, what do they have?  And when is it going to be

1  returned to the defendant or his counsel?

2        MR. CAZIER:  Your Honor, may I just say one more

3  thing?

4        THE COURT:  Yeah.

5        MR. CAZIER:  Apparently my client's situation is not

6  unique because I heard several of my colleagues stand earlier

7  this afternoon and say exactly the same thing --

8        THE COURT:  Yeah.

9        MR. CAZIER:  -- that personal notes were seized and

10  not returned.

11        MS. PLAYTON:  The problem with having the U.S.

12  Attorney's Office now go back and try to get personal notes

13  that these attorneys are claiming contain confidential

14  communications is we're creating an issue.  But we've never

15  seen these documents, nor do we intend to use them because we

16  don't have them.

17        THE COURT:  So all I'm asking from you all -- so

18  Mr. Cazier raised a good point.  So this goes beyond 13.  It

19  goes to 37, 10, 11, 19, 3, 36, 7, 27, 6, 4, 8, and I think I

20  missed a couple.

21        MR. SWITZER:  16, your Honor.

22        THE COURT:  Thank you.  16.

23        And so if you don't have anything, the government

24  just needs to say, "We have no documents from there."  And

25  then, if most of these are Geo, what I want to know, and what

1  the defendants want to know, and what their lawyers want to

2  know, is what happened to this stuff?

3         And, yeah, we can file administrative grievances with

4  Geo.  We can do this the hard way or we can do this the easy

5  way.  And I would suggest to you—all the easier way is just to

6  ask Geo and everybody else, what did you do with these bags

7  that we didn't get?

8         Mr. Mulliner.

9         MR. MULLINER:  Thank you.  May I approach the podium?

10        THE COURT:  Yes.

11        MR. MULLINER:  Your Honor, this Jeff Mulliner with

12 respect to Ricky or Ricardo Escobedo, defendant number 10 in

13 this indictment.  I believe that his seizure of his cell falls

14 into the category where the Court has a concern.  He is not

15 somebody that had something that's obviously discovery.  He is

16 not somebody who's had items returned to him that are

17 obviously attorney/client privilege.  So he falls into the

18 realm where the Court has to make a decision.

19        And the description by the taint team attorney,

20 Miss Norris, indicates that it was a single line piece of

21 paper with handwriting on it.  Her conclusion was calculation

22 of commissary expenses, question mark, notes appearing to

23 relate to case.

24        And my particular concern is, "notes appearing to

25 relate to case."  I believe that that's relates to a visit

1  that he's had with me, and so I just wanted to bring to your

2  attention that this is an item that we are seeking its return.

3  We are seeking that it not be forwarded to Mr. Gibson or to

4  Miss Playton.  And that's all.

5      THE COURT:  So with regard to Mr. Escobedo's matter,

6  and anybody else in these seven -- again, if I need to see

7  this document, and I don't have this one here, if I need to

8  see the document to make a ruling, produce it to me for a

9  ruling.  If the government is not going to use it, just return

10  it and say it's not going to be used.

11      MS. PLAYTON:  Miss Norris actually reached out to

12  many lawyers, and including, I think, Mr. Mulliner and said,

13  if you want it back, just let me know.  And I don't know if he

14  responded.

15      MS. NORRIS:  If you want to assert a privilege.  And

16  I did not hear back from Mr. Mulliner.

17      But I have it with me, Mr. Mulliner, if you would

18  like to look at it and decide if you want to assert a

19  privilege.

20      MR. MULLINER:  I assert a privilege.

21      THE COURT:  Why don't you look at if first before you

22  start asserting privileges?

23      MR. MULLINER:  Sure.

24      THE COURT:  Okay.  Thank you.

25      All of that is under advisement.

1          Next thing.  Motion for pretrial of Jencks material,

2    Mr. McCrum's motion.

3          What's the government's response?

4          MS. PLAYTON:  This is something that your Honor

5    routinely orders.  I would just ask that you do it in

6    accordance with your normal court orders.

7          THE COURT:  So that's going to be granted and we'll

8    figure out how that puts out into the scheduling order.

9          Next is motion for exculpatory and impeachment

10   evidence, Mr. McCrum's motion.  So there he's asking for

11   basically nine categories of documents.

12         What's the government's response?

13         MS. PLAYTON:  Your Honor, I did not know that the

14   Court was going to take up all of the motions, so I have not

15   seen that.  If it's routine and it's just the regular request,

16   I would ask that you take it up with your normal scheduling

17   orders.

18         THE COURT:  So I'm not going to rule on that yet.

19   I'm going to allow you-all to confer on that, what you can

20   agree to, because some of this may or may not be the usual

21   material that you give out and so we'll figure that out later.

22         Okay.  Next big topic, complaints about lawyers.  So

23   who is Victor Garcia's attorney?

24         DEFENDANT VICTOR GARCIA:  He's not here.

25         THE COURT:  So that's one big problem.  He's not

1   here.

2           Mr. Garcia, when is the last time you talked to your

3   lawyer?

4           DEFENDANT VICTOR GARCIA:  The day they first

5   appointed him to me.  He told me he was going to be my

6   attorney and come talk to me, and that's it.

7           THE COURT:  So give me a month and a date, or a year.

8           DEFENDANT VICTOR GARCIA:  Nine months ago.

9           THE COURT:  You haven't seen him in nine months?

10          DEFENDANT VICTOR GARCIA:  (Shaking head.)

11          THE COURT:  Do you want me to send your matter up to

12  the magistrate to get appointed a new lawyer?

13          DEFENDANT VICTOR GARCIA:  Yes, sir.

14          THE COURT:  So Mr. Garcia's oral request for a new

15  counsel is referred to the magistrate judge.

16          Next one.  Fernando Gonzalez.  Who is Mr. Gonzalez's

17  lawyer?

18          MR. VELA:  I am, your Honor.

19          THE COURT:  So when's the last tame you talked to

20  your client?

21          MR. VELA:  I have been -- it's been a few months,

22  your Honor.  I'll suggest that to the Court.  I have talked to

23  his family.  They have called my office.  I've told them I am,

24  and I am, going to go visit Mr. Gonzalez.  Again, I want to go

25  visit him when I have kind of all my ducks in a row and start

1 that process with all my –– he and I have talked as to the

2 initial complaint and what the government is alleging his role

3 was in this, and that happened a few months back.  I will

4 inform the Court that.

5          But where we are as to his exact numbers and

6 sentences and guidelines, I have not gotten into that.  I

7 think that's what he wants and I'm not there yet.  There are

8 some other issues that make his case a little bit different.

9          THE COURT:  So, Mr. Gonzalez, do you still have

10 confidence in your lawyer?  Do you want me to refer you for a

11 new lawyer?

12          DEFENDANT FERNANDO GONZALES:  It's been ten months,

13 sir.  I want a new one.

14          THE COURT:  You want a new lawyer?

15          MR. VELA:  I won't oppose that, your Honor.  That's

16 fine.

17          THE COURT:  Well, I'm not going to rule on that.

18 That's going to go up to the magistrate judge for appointment

19 of new counsel, and so that's referred.

20          Who is Joe Perez's attorney?

21          DEFENDANT PEREZ:  He's not here.

22          THE COURT:  Is your client –– is your lawyer

23 Mr. Huffman?

24          DEFENDANT PEREZ:  Yes, sir.

25          THE COURT:  And so, Mr. Gilmore, where is

1  Mr. Huffman?

2          MR. GILMORE:  Mr. Huffman is stuck in Mexico today,

3  Judge.  He flew down there was and was scheduled to fly back

4  and was on standby for a flight back but wasn't able to get on

5  a flight for whatever reason.  His flight is scheduled to

6  return on Wednesday, I believe.

7          THE COURT:  So are you retained, or are you court

8  appointed?

9          MR. GILMORE:  I just work in Mr. Huffman's office.

10         THE COURT:  So is Mr. Huffman retained or court

11  appointed?

12         MR. GILMORE:  Court appointed, Judge.

13         THE COURT:  So, Mr. Perez is alleging that

14  Mr. Huffman has told him that he does not get paid to go to

15  Guadalupe County.  That's just wrong.  I mean, if defense

16  counsel are traveling to where these defendants are being

17  held, that's compensable time.

18         So I don't know whether Mr. Huffman said that or

19  didn't say that, but attorneys, you know, you-all know that

20  you need to be reasonably conferring with your clients and

21  meeting with them, and if you travel to the facility, that's

22  compensable.

23         Mr. Perez, do you want me -- do you still have

24  confidence in Mr. Huffman, or do you want me to refer your

25  matter over?

```
1            DEFENDANT PEREZ:  I would like to get another one.

2   He came and asked me -- he told me he came back from Mexico.

3   I guess he's on his way back from Mexico again.

4            THE COURT:  I don't know what he's doing in Mexico.

5            So Mr. Perez's verbal request for a new attorney is

6   referred to the magistrate judge.

7            Okay.  Now, the status of discovery.  Has the

8   government produced all the evidence it believes it is

9   required to produce?

10            MS. PLAYTON:  There are several cell phones that,

11   first, they are the ones that were just recently seized, we

12   are still going through those.  There are some -- the phones

13   were made available to the defense attorneys, and I believe

14   there may be some additional discovery issues --

15            DEFENSE COUNSEL:  Your Honor, we can't hear.

16            MS. PLAYTON:  The cell phones that were seized --

17            THE COURT:  So let me backtrack so they could hear

18   you.  So I asked about the status of discovery.

19            MS. PLAYTON:  Okay.  So the answer is:  I believe

20   we've turned everything over.  The exception is the cell

21   phones that were just recently seized in December, those are

22   still undergoing analysis.  We have made the searches of the

23   other cell phones available at the FBI office to the defense

24   attorneys.  And I believe there is some discovery that we

25   still need to turn over related to some of the defendants, in
```

1  addition to what your Honor ordered today.

2          THE COURT:  And so when are you going to complete all

3  of that remaining discovery and have it available for the

4  defense attorneys for inspection?

5          MS. PLAYTON:  Within the next couple of weeks, your

6  Honor.

7          THE COURT:  Anybody want to respond?

8          Mr. Dombart.

9          MR. DOMBART:  George Dombart for Raul Ramos.

10          In reference to that, you know, we have, I think

11  about 78,000 pieces of discovery, when you count all the line

12  sheets and everything, at least when I do the get info on my

13  computer.  And then they are asking us to go to the FBI office

14  too, to go look at some other phones too.  And so, and you

15  know they are making us go through that hoop also.

16          You know, I'm sure a lot of us are still working

17  through a lot of that discovery, and then to take time away to

18  go to the FBI office, I think they should, if they have got

19  the calls, they should just go ahead and go through them and

20  start providing that to us too.

21          THE COURT:  Well, I'm not sure I understand what you

22  are asking for, Mr. Dombart.  They said they are going to have

23  everything for you in two weeks.  What are you asking for?

24          MR. DOMBART:  Well, because they have certain phones

25  that we were requested to go view at the FBI office.

1          THE COURT:  Oh, so you want whatever reports of the

2    existing phones copied and made available to you-all?

3          MR. DOMBART:  Exactly, your Honor, instead of us

4    having to go to the FBI and to go round and round about it.

5          THE COURT:  So what's the government's response on

6    that?

7          MS. PLAYTON:  Your Honor, it's not feasible, because

8    it's over 25 gigabytes of information, for us to duplicate

9    that 37 times or 35 times.  It's just not feasible, which is

10   why we made it available to defense.

11         THE COURT:  How many phones are we talking about?

12         UNIDENTIFIED FEMALE SPEAKER:  278.

13         THE COURT:  278 phones.  And so you downloaded 278

14   phones and now you have printouts of the entire downloaded

15   contents?

16         MS. PLAYTON:  I believe it's -- no.  We have digital

17   copies.

18         THE COURT:  It's digital version?

19         MS. PLAYTON:  Yes, your Honor.

20         Is that correct?

21         UNIDENTIFIED FEMALE SPEAKER:  That's correct.

22         THE COURT:  So if it's digital version, why isn't it

23   as easy as emailing to all of these guys?

24         MS. PLAYTON:  No.  No.  Your Honor, it wouldn't go.

25   I don't know if you've had this experience, we cannot email I

1  think more than —— our limit is very —— it's very limited.

2  You couldn't even —— I don't know how many hard drives you

3  have to ——

4          THE COURT:  Okay.  So let's scratch that idea.  Then

5  why can't you just burn it on a CD and make 38 copies?

6          MS. PLAYTON:  Well, because it's not feasible, your

7  Honor to do it.  We've made it available to them.  And I don't

8  know —— not everybody needs it and not everybody has made the

9  same complaint.  Now that we're in a room together, I suspect

10  a bunch of people are going to stand up.  But at this point,

11  nobody has complained about this and it has been made

12  available ——

13          THE COURT:  So let's make sure I understand this.

14  You have a digital download of 200-something phones.  Is it

15  one file?  Was it one megafile, or is it 207 individual files?

16          UNIDENTIFIED FEMALE SPEAKER:  Correct.  Each phone

17  that's able to be downloaded has its own report.  And if you

18  put all of that together, I have with —— one attorney had

19  indicated they were going to bring me a thumb drive and I

20  would download for their client what was relevant to their

21  client and provide that.  I've not received that yet, but we

22  can do that.  But if they want everything, it would take

23  probably a very large external hard drive, which we can do

24  that if they would like that.

25          MS. PLAYTON:  They would have to provide that, first

1  of all.  The government cannot buy –– the external hard drives

2  are between 50 to $100, so they would have to provide those to

3  us so that we could then burn them.  But we've made it

4  available.  Some attorneys have made requests to say, "Hey,

5  this is how I want to see it, can you do it this way?"  But

6  they have not followed up on it, I think is what the agent is

7  indicating.

8          THE COURT:  Mr. Dombart.

9          MR. DOMBART:  There have been other cases where we,

10 you know, I have supplied them with a hard drive.  This is the

11 first time I'm hearing it's 25 gigabytes.  I mean, that would

12 be several hard drives that we would have to supply.  Of

13 course, we can do that, and bill it to y'all, in the end.

14         THE COURT:  We are going to pay for this one way or

15 the other.

16         MR. DOMBART:  It can be done.  But, you see, if we

17 have to go to the FBI office to review all of that, you know,

18 then we are going to be sitting in the FBI office for two

19 weeks.

20         THE COURT:  Counsel.

21         MR. MORRIS:  Well, I'm sure the government agent

22 would be acting in the utmost good faith as to what they

23 believe is important as to my client.  The Court sees my

24 issue, your Honor.

25         THE COURT:  Yeah.

1          MR. MORRIS:  And if it's that darn voluminous, we are

2    going to have to have it in some sort of fashion we can sit at

3    the house in our underwear and look at it.

4          THE COURT:  Yeah.  I don't want the government making

5    choices about what they think is relevant to each individual

6    defendant.  Likewise, sometimes I get defense lawyers saying,

7    "Judge, they are giving me all this stuff.  I only want the

8    stuff that's pertaining to my defendant."  And I always tell

9    the defense counsel, "No, we are not going to put the

10   government in the position of deciding what's relevant to your

11   client.  That's your job."

12         So I still don't understand this hardship on the

13   government on the cell phones.  In you are allowing everybody

14   to come in with a hard drive or a flash drive that would be of

15   sufficient size to download all of this, I don't know why you

16   won't get your technicians to make a CD of each individual

17   cell phone download and then burn 33 copies of each of those

18   CDs.

19         MS. PLAYTON:  You know, your Honor, there might be a

20   way to do like -- well, first, I would just note, these are a

21   bunch of cell phones, which probably contain, in addition to

22   evidence of crime, personal photographs which may or may not

23   be revealing and very personal in nature, and much of it

24   irrelevant.

25         However, there might be a way to do like a Cloud

1   sharing feature.  I don't know.  Because of the volume, I
2   think that's something worth exploring.  But what I would say
3   to the Court is until today maybe only a handful of people
4   have said anything and had made any request to view them.
5   So...
6           THE COURT:  Well, now that they are complaining about
7   attorney incompetence, everybody is now wanting to look at
8   stuff.
9           MS. PLAYTON:  What I think I might do is talk to the
10  FBI and see if there is some sort of Cloud sharing.  What I
11  will say is, if that works, it isn't forever.  It isn't
12  indefinite.  It is a finite about of time, because we buy the
13  space, we use the space, and we're paying for it while it's up
14  there.  So if we go that route, and people will want to see
15  it, then they are going to have to take advantage of that time
16  frame.
17          THE COURT:  Here's the ruling.  You have two weeks to
18  turn this over, and unless you reach an agreement with each
19  individual defendant's counsel, you know, then the default
20  will be ordered production of CDs.  So, there's --
21          MS. PLAYTON:  When you say two weeks to turn it over,
22  you mean to --
23          THE COURT:  You have two weeks to turn it over via a
24  Cloud sharing site.  You have two weeks to turn it over, over
25  individual CDs.  You have to two weeks to turn it over by them

1    coming to your office in flash drives.

2         MS. PLAYTON:  The only thing I would say, your Honor,

3    we've already made it available.  And I understand that

4    today's atmosphere, everybody is asking for it, but two weeks

5    may not be practical.

6         THE COURT:  I picked your number.

7         MS. PLAYTON:  Did I say two weeks?

8         THE COURT:  Yes.

9         MS. PLAYTON:  For this?

10        THE COURT:  Yes.

11        MS. PLAYTON:  I don't believe -- if I did I misspoke.

12   I said two weeks for everything else.  I wasn't talking about

13   this.  I was talking about --

14        THE COURT:  So how much time can you do this?

15        MS. PLAYTON:  Well, I would like at least a month,

16   but I would like the Court to be open to the possibility that

17   the technology of it may be beyond my control.

18        THE COURT:  You have a month.

19        MS. PLAYTON:  Thank you.

20        MR. DOMBART:  And, your Honor, I was going to also

21   state that to make sure if they are going to do it in a Cloud

22   sharing that we can download it and not that we have to go

23   view it on the Cloud only, that it is downloadable.  And,

24   second, I think it's up to us to determine if it's relevant or

25   not, and so I think we should be provided everything.

1            THE COURT:  No, I agree with that part.

2            Now, the other part, and gentlemen I know you each

3  represent an individual defendant, but you might want to

4  confer among yourselves and try to come up with like a lead

5  team of three lawyers that, you know, it's almost like a class

6  action case where in civil cases we have, you know, a lead

7  trial team for plaintiffs where you all pick among yourselves

8  two or three of your colleagues and be the point persons for

9  these kind of discovery disputes, or else we're never going to

10 get through all of this.  So I'm not going to pick favorites

11 among you-all.  You figure among yourselves who you want these

12 persons to be.

13           So there is a lot of work to do in this case and

14 we're still set for trial in two and a half months.

15           MR. DOMBART:  And, your Honor, I've always believed

16 from the beginning that this should be designated as a complex

17 case.  I had sent out a mass email.  There was some opposition

18 to it, but these then I noticed Mr. Morris filed a motion --

19           MS. PLAYTON:  You designated it complex, your Honor.

20           THE COURT:  So it has been designated and we have a

21 certain trial date here.  I guess I'm questioning:  "Is it

22 going to be reached?"

23           MR. DOMBART:  I couldn't imagine Mr. Gibson being

24 able to get caught up.  I mean, I think scheduling-wise you

25 probably are looking at 2018 -- I mean, I'm sorry -- 2019.

1           THE COURT:  I'm not sure I want to extend it that

2   long, and so I'm thinking fall-ish is more appropriate, but

3   I'm not going to rule on this yet.  I want you-all

4   collectively, and maybe the lead three, circulate something.

5   You-all need to come up with a new scheduling order in this

6   case.  You-all need to come up with a new trial date that most

7   of you-all can accommodate.  I know there is always going to

8   be moaning and groaning from somebody, but we have to have a

9   trial date that most of you can reach.

10          Confer with Miss Greenup about my availability for a

11  trial date.  I am thinking the fall, and then when you start

12  working yourself backwards.  What's going to be the deadline

13  to turn over 404(b) evidence?  What's going to be the deadline

14  to have a hearing on motions in limine?  What's going to be

15  the deadline to turn over Jencks material?  What's going to be

16  the deadline for exchanging witness lists?  What's going to be

17  the deadline for exchanging exhibits?

18          And so those are the major points that I see that

19  this new scheduling order needs to consider, and you are

20  welcome to add more points to that list, if you think that

21  more points need to be added.  But we need to start working on

22  this now, rather than later.

23          Mr. Dombart.

24          MR. DOMBART:  You are talking about basically like a

25  scheduling order we would do in a civil case.

```
1            THE COURT:  Yes, exactly.  I'm looking for firm
2   deadlines that you-all know what exhibits are going to be used
3   at trial, so each of the defendants know what exhibits are
4   going to be used at trial and they can figure out, based upon
5   what's shaping up, what's in my best interest to do after
6   conferring with you-all.
7            MS. PLAYTON:  Your Honor, the only thing I would just
8   suggest to the Court --
9            DEFENSE COUNSEL:  I can't hear, Judge.
10           MS. PLAYTON:  The only thing I would suggest to the
11  Court, is that, your Honor, Charlie Strauss and I had a
12  37-defendant case before the court and it was, while it was
13  not designated complex, it shaked down a lot differently.
14           THE COURT:  Well, most of them pled out.
15           MS. PLAYTON:  Well, but not all at once and it was
16  over time.  So the only thing I would ask the Court to
17  consider, is you still -- this case, even though it was
18  indicted last year is relatively early.  We've only had, I
19  think, one or two docket settings at best and discovery is
20  still ongoing.  Your Honor just designated this complex.
21           And so what I would suggest to the Court, while I
22  understand you want the scheduling order and you are looking
23  to try to find a date down the road, I would say that maybe
24  not putting the cart before the horse at this point, because I
25  can also tell the Court there are still -- negotiations are
```

1    ongoing, and so I would just like you to consider that.

2          THE COURT:  The reality is, as you-all know it, we're

3    busy here.  I've got now inherited cases in Austin that I have

4    to deal with.  I've got two complex criminal cases in Austin

5    that I've got to deal with in the summer.  At some point, I

6    need to, for my own court scheduling purposes, figure out, you

7    know, what is going on with all these cases.

8          And there is possibilities that here in this

9    courthouse more cases are going to get reassigned, and so I

10   need to have some certainty about the trial docket.  So these

11   lawyers need to have certainty about what they are looking at

12   here.  And I don't want to arbitrary shoot for a date in June

13   that everybody -- I sense from the nods in the room that

14   three-quarters of the lawyers here in this room know that

15   we're not going to reach a June setting, and so why are we all

16   going through this farce of a June setting, if it's not going

17   to happen?

18         And so we all have lots of work to do.  There is

19   still lots of discovery to be reviewed yet.  There is at least

20   two, if not three defendants, who want new lawyers.  And I've

21   got to make rulings now yet on 20-something odd pending

22   motions, and I still need to wait to hear from your briefing

23   on resolving some of the pending issues.

24         Now, with regard to lawyers who failed to show, an

25   order to show cause will be issued to George Schaeffer asking

1  for his explanation as to why he did not appear.  The other

2  lawyer I'm missing is David Dilley.  He's apparently out on

3  military leave?

4          DEFENSE COUNSEL:  That's correct, your Honor, I just

5  got a text from him.

6          THE COURT:  Well, it would be nice if he would notify

7  me in advance that that he's not going to be here and let his

8  client know that he's not going to be here.

9          DEFENSE COUNSEL:  I understood that he had informed

10 the Court.  I don't know if it was timely or not.

11         THE COURT:  Well, if he passed it on to the clerk's

12 office, it didn't make its way over here.  But because he's on

13 military duty, he's excused.  So then George Schaeffer is the

14 only one we're issuing an order to show cause to explain his

15 absence.

16         And the other points I want you-all to discuss on the

17 scheduling order are a deadline to submit voir dire questions

18 and a deadline to submit jury instructions.

19         Anything else anybody wants to take up at this time?

20         Miss Norris?

21         MS. NORRIS:  Your Honor, just one thing.  I think it

22 would be helpful to the Court if Mr. Morris and I could either

23 come to the bench or meet in chambers with you on the

24 specifics of his case.

25         THE COURT:  We'll meet in chambers after this.

1           MS. NORRIS:  Thank you.

2           THE COURT:  Anything else?

3           MR. MALDONADO:  May I approach the bench, Your Honor?

4           THE COURT:  Yes.

5           Before I forget, when we do that scheduling order, to

6    indicate how many trials days are expected.

7       (At the bench)

8           MR. MALDONADO:  This concerns your previous

9    statements ruling.  My client is one who may have made a

10   confession, and so if I understand the Bruton rule, the

11   statement would only be produced to those defendants who are

12   implicated, and I would ask that the Court limit it that way.

13          THE COURT:  Okay.  I've not seen -- who is your

14   client?

15          MR. MALDONADO:  Number 35.

16          THE COURT:  35.  So I haven't been provided with a

17   copy of what he wrote down, so I haven't seen it.

18          MR. MALDONADO:  It wasn't --

19          MS. PLAYTON:  It was a confession.  It was a poster

20   and it said, this relates to your --

21          THE COURT:  Oh, okay.

22          MS. PLAYTON:  And, you know, your Honor, as I'm

23   thinking about that, I am concerned.  Many of these men are

24   housed together, and if we turn this over, I would like your

25   Honor to be open to the idea of us crafting a way -- he

1  represents one of those people -- that would not place them in
2  jeopardy.
3      THE COURT:  Yeah.  I mean, don't misunderstand me.
4  I'm trying to strike a balance between giving everybody enough
5  discovery that they can make intelligent decisions and then
6  trying to protect everybody.  So if we can craft something, I
7  am, of course, willing to do that.
8      MR. MALDONADO:  But I know the Court ordered its
9  production, and I just want to know before it's produced that
10 there be some safeguards.
11     THE COURT:  It's produced pursuant to the protective
12 order.  So now, with regard to verbally, I mean, so I'm going
13 to want you-all, it's your protective order, why don't you
14 amend the protective order.  I'll take a look at it for
15 language that with regard to any confessions or plea
16 agreements that counsel are prohibited from mentioning who
17 confessed or who pled.  Maybe that's how.  I mean, all they
18 need to know, don't they, is, "Hey, one of your brother has
19 pled.  We just can't tell you who."
20     MS. PLAYTON:  Could we turn it over with the name
21 redacted?
22     THE COURT:  Redacted?  Yeah.  I'm okay with that too.
23     MR. MALDONADO:  But if I understand correctly, it
24 would be produced only to the defendant that is incriminated,
25 not everyone.

1          THE COURT:  So that's what I'm trying to get at.

2          MR. LEACHMAN:  This is illustrative of the problem,

3    is that, I mean, if we could redact it, and then he didn't, I

4    mean, if it was implicating his client, he doesn't know which

5    person is saying it, what their problem is.

6          THE COURT:  So maybe it's like redact not only name

7    but any kind of information that would lead to the disclosure

8    of the identity.  I'm willing to go steps to protect people,

9    you guys know the case better than I do, to craft this order,

10   so...

11         MR. MALDONADO:  Maybe it's a trial issue, Judge.

12   Maybe this woman never testifies.  I mean, it's not

13   discoverable at this point under Rule 16.

14         THE COURT:  I understand that too, but the other part

15   is, if any of these other 29 are ever going to plead, they

16   have got to be given tidbits that this thing's --

17         MR. LEACHMAN:  We need to work on that.

18         MR. GIBSON:  We will sit down and talk to people

19   individually and whittle it down, but I share counsel's

20   concerns.

21         MR. MALDONADO:  I don't want it to be produced, at

22   least right now, your Honor.

23         THE COURT:  I understand what you are saying.  Craft

24   something new for me.

25         MR. LEACHMAN:  One other thing I wanted to bring up

1   with you.  On this discovery of these cell phones, and I don't

2   know, it's hard to stand up and say, but these people have

3   like nude pictures of their family and wife and all of that

4   stuff.  I mean, do we want that where everyone can download

5   all of it?  I mean, I would –– you know, you can have a disk

6   of your own guy and you can see the other stuff, that's ––

7          THE COURT:  So you are in control of this stuff.  Can

8   you download –– can you redact, for lack of a better phrase,

9   can you redact the cell phone download to delete all the

10  pictures that are not relevant to this case, and text messages

11  that are not relevant?

12         MR. LEACHMAN:  Probably not.  I mean, the easiest

13  thing for us is just to turn it all over.  That's what you

14  ordered me to do that, so I'm going to do it.

15         THE COURT:  Well, so here's the problem though.  If

16  you guys aren't going to go through that extra step of taking

17  that stuff out, and then the choice is either complete turn

18  over the phone, or you–all limit the redaction.  And you guys

19  aren't willing to limit the redaction, so I've got to let

20  these guys see the phones.  I mean, I can't let them –– I

21  can't not give them the phones.

22         MR. LEACHMAN:  No.  That's what I'm saying.  I think

23  maybe you make it available, not downloadable for people to

24  look at all of them, and maybe you make a disk with a copy

25  with ––

1          THE COURT:  With all due respect to your brethren,

2  some of them are lazy, so if we don't affirmatively say, "We

3  gave it to them," then, you know, I'm setting this whole case

4  up for ineffective assistance of counsel claims later when

5  they come up and say, "They didn't do this, they didn't do

6  that."  Hell, I have lawyers not even showing up to court.

7          MS. PLAYTON:  In terms of scheduling down the road,

8  your Honor, I just, my concern really is that by bringing them

9  all here they are really emboldened and think that they all

10  have to stand together and they need to remain a gang.  And I

11  would ask the Court, not everybody today filed a motion or

12  filed a motion to join, so perhaps in the future if we are

13  going to have these types of conferences, we could limit it to

14  the relevant parties, or if at all feasible, only to the

15  parties that, one at a time.

16          MR. MALDONADO:  Your Honor, I'm just feeling

17  uncomfortable right now because issues are being raised beyond

18  what I raised to this Court.  I can't speak for my defense

19  counsel out there.  You know, the only thing is the

20  confession, is the release of his confession, and you know,

21  that there have to be safeguards.  That's my concern.

22          THE COURT:  I understand where you are coming from.

23          MS. PLAYTON:  It's making me think that those types

24  of issues will keep coming up.

25          THE COURT:  Give me a new protective order.

1      (Open court.)

2           THE COURT:  Any attorney want to be recognized before

3   we adjourn?

4           DEFENSE COUNSEL:  I was just going to ask, your

5   Honor, a guesstimate on the government's part, not holding

6   their feet in concrete, but how long they think this trial is

7   going to last.

8           THE COURT:  So when you all engage in this new

9   scheduling order, I want an estimation of trial days included

10  in this new scheduling order.

11          MR. DOMBART:  Your Honor, George Dombart again for

12  Mr. Ramos.  And I know I had filed a motion regarding a

13  transfer to Geo, but I want to address that issue again

14  because I received several complaints from Mr. Ramos about the

15  conditions, number one, is that there is no access to the law

16  library; number two is there is some hygiene issues, that they

17  don't allow him to shower and things except for like once a

18  week I think; and three, there is a spider infestation over

19  there.

20          And if you like, he can tell you exactly.  And I

21  understand that the marshals are responsible for placement and

22  stuff, but, you know, he would like the opportunity to be able

23  to have access to a law library and I don't know if they have

24  one there or not, but he is the number one defendant, and

25  so...

1          THE COURT:  Again, I have no authority over the

2    marshal's office about placement.  So now all I can suggest to

3    your client is that he can file an administrative grievance at

4    the facility complaining about denial of access to the law

5    library and complain of denial to shower facilities on a

6    regular basis, but that's his remedy.

7          MR. DOMBART:  I've also suggested to him to write the

8    marshals about it too, so...

9          THE COURT:  So, you know, he can write to the

10   marshals or you can write on his behalf to the marshals and

11   make the complaints.  The marshals have the contract with that

12   facility, and so ultimately the marshals are the contract

13   holder.

14         MR. DOMBART:  Yes, your Honor.

15         THE COURT:  Anything else from any of the defense

16   counsel?

17         And with that, we're adjourned.

18      (Concludes proceedings.)

19

20

21

22

23

24

25

```
 1                              -o0o-

 2        I certify that the foregoing is a correct transcript from

 3   the record of proceedings in the above-entitled matter.  I

 4   further certify that the transcript fees and format comply

 5   with those prescribed by the Court and the Judicial Conference

 6   of the United States.

 7

 8   Date:  08/15/18            /s/  Gigi Simcox
                                United States Court Reporter
 9                              655 East Cesar E. Chavez Boulevard
                                San Antonio, TX 78206
10                              Telephone:  (210) 244-5037

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```